**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WILLIAM NORMAN BROOKS, III,

      *Plaintiff*,

    v.

TRANS UNION, LLC,

      *Defendant*.

Civil Action No. 2:22-CV-00048-GEKP

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

James A. Francis, Esq.
Lauren KW Brennan, Esq.
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(T) 215-735-8600
(F) 215-940-8000
jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Tammy Hussin
**Hussin Law Firm**
1596 N. Coast Hwy 101
Encinitas, CA 92024
(T) 877-677-5397
(F) 877-667-1547
Tammy@HussinLaw.com

*Attorneys for Plaintiff and the Class*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ................................................................................................................. 5

    A.  Trans Union's Practices For Reporting Information Concerning Bankruptcies ................ 5

    B.  Trans Union's History Of Inaccurate Bankruptcy Reporting ............................................... 7

    C.  The Experience Of Plaintiff William Norman Brooks, III ................................................ 8

    D.  The Proposed Class Of Similarly Situated Consumers ..................................................... 10

    E.  Objective Records Available For Class Member Identification ....................................... 11

III.  ARGUMENT ..................................................................................................... 14

    A.  Legal Standards Governing Class Certification ................................................................ 14

        1.  The Requirements of FED. R. CIV. P. 23(a) ........................................................ 16

            a.    Numerosity .................................................................................... 16

            b.    Commonality .................................................................................. 18

            c.    Typicality ....................................................................................... 19

            d.    Adequate Representation ............................................................... 20

        2.  The Requirements of FED. R. CIV. P. 23(b) ........................................................ 22

    B.  Appointment and Approval of Class Counsel Is Warranted ............................................. 25

    C.  Plaintiff's Trial Plan ......................................................................................................... 25

IV.   Conclusion ......................................................................................................... 27

## **TABLE OF AUTHORITIES**

**CASES**                                                                    **Page(s)**

*Barel v. Bank of America*,
   255 F.R.D. 393 (E.D. Pa. 2009)........................................................................21

*Montgomery Cty., Pa. ex rel. Becker v. MERSCORP, Inc.*,
   298 F.R.D. 202 (E.D. Pa. 2014)................................................................15, 19

*Boyle v. Progressive Specialty Ins. Co.*,
   326 F.R.D. 69 (E.D. Pa. 2018)........................................................................17

*Cavin v. Home Loan Ctr., Inc.*,
   236 F.R.D. 387 (N.D. Ill. 2006)......................................................................23

*Chakejian v. Equifax Info. Servs., LLC*,
   256 F.R.D. 492 (E.D. Pa. 2009)......................................................................23

*City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*,
   867 F.3d 434 (3d Cir. 2017)............................................................................17

*Clark v. Trans Union Corporation and Trans Union, LLC*,
   C.A. No.8:00-1219-22 (D.S.C.) .............................................................. *passim*

*In re Data Access Sys. Sec. Litig.*,
   103 F.R.D. 130 (D.N.J. 1984)..........................................................................19

*Der Hacopian v. SentryLink*,
   C.A. 18-3001 (D. Md. Nov. 23, 2020)............................................................21

*Gates v. Rohm and Haas Co.*,
   265 F.R.D. 208 (E.D. Pa. 2010).........................................................................4

*Gillespie v. Equifax Info. Servs., LLC*,
   2008 WL 4614327 (N.D. Ill. Oct. 15, 2008)..................................................23

*Gulf Oil Co. v. Barnard*,
   452 U.S. 89 (1981)....................................................................................14, 15

*In re Hydrogen Peroxide Antitrust Litigation*,
   552 F.3d 305 (3d Cir. 2008)............................................................................15

*Johnston v. HBO Film Management, Inc.*,
   265 F.3d 178 (3d Cir. 2001)......................................................................15, 18

*Kelly v. RealPage, Inc.*,
   47 F.4th 202 (3d Cir. 2022) .....................................................................17, 18

*Lake v. First Nationwide Bank*,
   156 F.R.D. 615 (E.D. Pa. 1994)...........................................................................24

*Lewis v. Curtis*,
   671 F.2d 779 (3d Cir. 1982)...............................................................................22

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012)...............................................................................18

*Martinez v. Avantus, LLC*,
   343 F.R.D. 254 (D. Conn. 2023).........................................................................21

*McCall v. Drive Fin. Servs., L.P.*,
   236 F.R.D. 246 (E.D. Pa. 2006).........................................................................19

*McDonough v. Toys R Us, Inc.*,
   638 F. Supp. 2d 461 (E.D. Pa. 2009) ................................................................20

*McIntyre v. RealPage, Inc.*,
   2023 WL 2643201 (E.D. Pa. Mar. 23, 2023).....................................................21

*McIntyre v. RealPage, Inc.*,
   336 F.R.D. 422 (E.D. Pa. 2020)...............................................................18, 23, 24

*Miller v. Trans Union, LLC*,
   2017 WL 412641 (M.D. Pa. Jan. 18, 2017).................................................18, 23

*Murray v. New Cingular Wireless Services, Inc.*,
   232 F.R.D. 295 (N.D. Ill. 2005).........................................................................23

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016)...............................................................................19

*Patel v. Trans Union, LLC*,
   308 F.R.D. 292 (N.D. Cal. 2015)........................................................................21

*In re Prudential Ins. Co. Am. Sales Prac. Litig.*,
   148 F.3d 283 (3d. Cir. 1998).....................................................................14, 23, 24

*Ramirez v. Trans Union, LLC*,
   2022 WL 17722395 (N.D. Cal. Dec. 15, 2022)..................................................21

*Ramirez v. Trans Union, LLC*,
   2017 WL 5153280 (N.D. Cal. Nov. 7, 2017) .............................................24, 27

*Scott v. University of Delaware*,
   601 F.2d 76 (3d Cir. 1979)................................................................................19

*Serrano v. Sterling Testing Sys., Inc.*,
711 F. Supp. 2d 402 (E.D. Pa. 2010) ...................................................................24

*Soutter v. Equifax Info. Servs., LLC*,
307 F.R.D 183 (E.D. Va. 2015) ...........................................................................19

*Stewart v. Abraham*,
275 F.3d 220 (3d Cir. 2001)...............................................................................16

*Stillmock v. Weis Mkts., Inc.*,
385 Fed. App'x. 267 (4th Cir. 2010) ..................................................................23

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d. Cir. 2011)..............................................................................15

*Summerfield v. Equifax Info, Servs. LLC*,
264 F.R.D. 133 (D.N.J. Sept. 30, 2009).............................................................23

*Taha v. Cty. of Bucks*,
862 F.3d 292 (3d Cir. 2017)..............................................................22, 23, 24

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, 131 S.Ct. 2541 (2011)...............................................................18

*Weiss v. York Hosp.*,
745 F.2d 786 (3d Cir. 1984)..............................................................................16

*White v. Experian Info. Solutions, Inc.*,
993 F. Supp. 2d 1154 (C.D. Cal. 2014), *aff'd sub nom.*
*Radcliffe v. Experian Info. Solutions, Inc.*, 818 F.3d 537 (9th Cir. 2016) .........................21, 22

## STATUTES

Fair Credit Reporting Act 15 U.S.C. §§ 1681-1681x ......................................... *passim*

15 U.S.C. § 1681e(b) ...............................................................................4, 18, 21, 27

15 U.S.C. § 1681i(a)(5)(b)......................................................................................4

15 U.S.C. § 1681n ...............................................................................................20

## FEDERAL RULES

Fed. R. Civ. P. 23 ....................................................................................... *passim*

FED. R. CIV. P. 23(a) ...............................................................................16, 19, 22

FED. R. CIV. P. 23(a) .............................................................................................1

iv

Fed. R. Civ. P. 23(a)(1) ................................................................16

Fed. R. Civ. P.  23(a)(2) ...............................................................18

Fed. R. Civ. P.  23(a)(3) ...............................................................19

Fed. R. Civ. P.  23(a)(4) ...............................................................20

Fed. R. Civ. P.  23(b) ...............................................................15, 22

Fed. R. Civ. P. 23(b)(3) ......................................................1, 15, 22, 24

Fed. R. Civ. P. 26(b)(4) ................................................................5

Fed. R. Civ. P.  23(c) ..................................................................25

Fed.R.Civ.P. 23(c)(1) ...................................................................4

Fed. R. Civ. P. 23(c)(1)(B) .......................................................25, 26

Fed. R. Civ. P. 23(c)(1)(C) ...........................................................15

## OTHER AUTHORITIES

2 H. Newberg, Newberg on Class Actions (4th ed. 2002) §7.22 ...........................................15

Plaintiff William Norman Brooks, III, by counsel, respectfully submits this memorandum of law in support of his Motion for Class Certification pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

## I.    INTRODUCTION

A bankruptcy filing is among the most injurious pieces of information that can be included on a consumer's credit report – it negatively reflects that the consumer did not meet his or her credit obligations and routinely leads to automatic disqualification for credit within certain timeframes. Bankruptcy comes with reputational consequences as well as financial ones: the word "bankrupt" is synonymous with "broken" or "ruined," and is used to describe "a person who is completely lacking in a particular desirable quality or attribute."[1]  This consumer class action addresses Defendant Trans Union, LLC's ("Trans Union's") systematic misreporting of harmful bankruptcy information on certain consumers' credit reports before the filing of this case, and for a period thereafter.

As described more fully below, bankruptcy filings are presented on a credit report in two ways. First, they appear in the public record section of the report, where the consumer reporting agency identifies the date of the filing, the court where the action was filed, and the case number.

**PUBLIC RECORDS**




---

[1] *See* Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/bankrupt (last accessed Feb. 2, 2024).

*See* Trans Union Credit Report User Guide at p. 10, *available at* https://www.transunion.com/docs/rev/business/clientResources/HowToReadCreditReport.pdf (last accessed Feb. 2, 2024). These records are designed to replicate bankruptcy filings available on public docket, accessible through the Public Access to Court Electronic Records ("PACER") system.

Bankruptcy filings are also referenced as comments on credit reports in connection with individual accounts such as credit cards or loans, known in the credit reporting industry as "tradelines." When a creditor learns that an account holder has filed for bankruptcy, it will report this information to consumer reporting agencies ("CRAs") such as Defendant Trans Union using one of several standardized "remarks codes" referencing a bankruptcy, leading to a notation regarding the bankruptcy on a credit report such as the language "included in bankruptcy."

**BANK OF AMERICA** #414734205287**** ( PO BOX 982238, EL PASO, TX 79998-2235, (800) 421-2110 )

| | | Balance: | | Pay Status: Current; Paid or Paying as Agreed |
| --- | --- | --- | --- | --- |
| Date Opened: | 10/11/2017 | | | Date Closed: 01/06/2020 |
| Responsibility: | Individual Account | Date Updated: | 01/08/2020 | |
| Account Type: | Revolving Account | Last Payment Made: | 01/02/2020 | |
| Loan Type: | CREDIT CARD | High Balance: | $10,647 | |
| | | Credit Limit: | $17,000 | |

Remarks: >CHAPTER 13 BANKRUPTCY<; CLOSED BY CREDIT GRANTOR

Estimated month and year that this item will be removed: 12/2026

| | 12/2019 | 11/2019 | 10/2019 | 09/2019 | 08/2019 | 07/2019 | 06/2019 | 05/2019 | 04/2019 | 03/2019 | 02/2019 | 01/2019 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 12/2018 | 11/2018 | 10/2018 | 09/2018 | 08/2018 | 07/2018 | 06/2018 | 05/2018 | 04/2018 | 03/2018 | 02/2018 | 01/2018 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 12/2017 | 11/2017 | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Rating | OK | OK | | | | | | | | | | |

*See* ==Ex. 1 at BROOKS-TU0000063==.[2]

By Trans Union's own admission, these two types of bankruptcy records should go together – if there is a bankruptcy remark on a tradeline, it should be accompanied by a public record. The reason is obvious: a credit card account cannot have been "included in bankruptcy" if the cardholder never filed for bankruptcy.

---

[2] References to Exhibit ("Ex.__") herein refer to those exhibits attached to the Declaration of James A. Francis in support of Plaintiff's Motion for Class Certification, filed herewith.

Trans Union acknowledged this reality when it changed its practices in response to litigation brought and settled years ago regarding the reporting of bankruptcies on jointly held credit accounts where only one account holder filed for bankruptcy.  In the sweeping settlement of the *Clark v. Trans Union Corporation and Trans Union, LLC,* C.A. No.8:00-1219-22 (D.S.C.) case, Trans Union agreed not to report bankruptcy remarks codes on jointly held account tradelines unless there was a bankruptcy in the public record section of the report, "or Trans Union's records otherwise indicate that bankruptcy should be reflected for the consumer who is the subject of the Credit Report[.]" *See* C.A. No. 8:00-1219-22 (D.S.C.) at ECF 309 pp. 6-7 (attached hereto as Exhibit 2). Trans Union implemented this agreement by conducting a cross-check for the presence of a public record bankruptcy on all files where a bankruptcy remark appeared on a jointly held tradeline.

Unfortunately, Trans Union failed to apply this cross-check process to tradelines with only a single account holder for almost twenty years, even though the same logic would apply to such accounts. Instead, for most accounts, Trans Union simply assumed that bankruptcy remarks codes are accurate, even when it has not identified a public record bankruptcy filing by the consumer – or worse, when it had suppressed or removed a public record bankruptcy because it was unreportable due to age or inaccuracy.  Continued reporting of such bankruptcy remarks codes misrepresents the consumer's credit history by indicating the consumer had a recent and relevant bankruptcy filing.

This is precisely what happened to Plaintiff William Norman Brooks, III. Plaintiff has never filed for bankruptcy.  When another William Brooks filed for bankruptcy in Alabama, one of Plaintiff's creditors Bank of America, N.A. ("Bank of America") inaccurately concluded that Plaintiff was the filer.  Bank of America closed his accounts and reported to the CRAs including

Trans Union that Plaintiff had filed for bankruptcy. ==Pursuant to its standardized procedures, Trans Union simply included Bank of America's inaccurate bankruptcy remarks in Plaintiff's file==, and in fact sold a credit report to a prospective mortgage lender that included the inaccurate remark, again reflecting his non-existent bankruptcy. Trans Union never cross-checked the public records section of the report to see whether it included a public record of the bankruptcy filing as it learned to do in *Clark*. It did not.

Plaintiff asserts that Trans Union's failure to conduct this cross-check led directly to its reporting of inaccurate bankruptcy information about him, and that this failure violates Trans Union's obligation under section 1681e(b) of the Fair Credit Reporting Act to follow "reasonable procedures to assure the maximum possible accuracy" of the credit reports it sells. Trans Union's inaccurate reporting was the result of standardized procedures that affected thousands of other individuals. Plaintiff therefore moves this Court to certify this action for class treatment pursuant to Fed. R. Civ. P. 23, for the following class of consumers:

> All natural persons with an address in the United States and its Territories about whom Defendant sold a consumer report to a third party from January 6, 2020 to January 31, 2023 which included a bankruptcy remark on a tradeline, but with no reference to a bankruptcy record in the public record section of the same report, and for whom there is no government-held public record of a bankruptcy filing within ten (10) years prior to the date of the report.[3]

---

[3]    Plaintiff has brought additional claims in this matter, including that Trans Union improperly reinserted the bankruptcy remarks into his file after his dispute in violation of FCRA section 1681i(a)(5)(b), and under the California state corollary to the FCRA. ECF 13, Am. Compl. Plaintiff proposed several class definitions in his Amended Complaint (*id.* at ¶ 49). Based upon developments in discovery Plaintiff has elected to seek certification only of a refined version of the "Tradeline-only Bankruptcy Class" pled in ¶ 49(c) of the Amended Complaint. Such refinement is entirely appropriate and expected in class action litigation. *Gates v. Rohm and Haas Co.*, 265 F.R.D. 208, 215 n.10 (E.D. Pa. 2010) ("Sensibly, modification of a class definition is contemplated by the Federal Rules of Civil Procedure, see Fed.R.Civ.P. 23(c)(1), and a court 'is not bound by the class definition proposed in the complaint[.]'" (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.1993)). Plaintiff continues to pursue his claims regarding the improper reinsertion of bankruptcy information in his file, and under the California Consumer Reporting Agencies Act on an individual basis.

II.    **FACTS**

A.    **Trans Union's Practices For Reporting Information Concerning Bankruptcies**

Trans Union is among the largest consumer reporting agencies in the country, known as the "Big Three."    *See*    https://www.consumerfinance.gov/consumer-tools/credit-reports-and-scores/consumer-reporting-companies/companies-list/    (identifying    the    Big    Three); https://www.transunion.com/about-us.

Trans Union reports bankruptcy information in two ways: in the public record section of reports, and on tradelines. During the relevant time period in this case, Trans Union obtained public records of bankruptcies from a private data vendor, Lundquist Consulting, Inc. Ex. 3, Deposition of James Garst ("Garst Dep.") at 59:9-60:10, 60:17-22.[4] This vendor delivered a direct daily feed into Trans Union's main consumer reporting database. *Id.* at 61:3-24. Trans Union's system then evaluated the personal identifying information available on each bankruptcy record received and determined whether to place a bankruptcy record in a file concerning a particular consumer. *Id.* at 63:20-64:16. Trans Union only includes such records in a consumer's existing file and thus on a credit report about them if the personal identifiers available satisfy Trans Union's match logic algorithm. Ex. 4, Deposition of Corinne Wodzinski ("Wodzinski Dep.") at 121:3-122:16.[5] If the match logic is not satisfied, that means that Trans Union is not sufficiently confident that the bankruptcy pertains to a consumer. *Id.*

---

[4]    Mr. Garst is a Trans Union employee and testified as one of Defendant's corporate representatives on March 17, 2023.

[5]    Defendant disclosed Ms. Wodzinski, one of its own employees with a long tenure at Trans Union, as a purported expert under Fed. R. Civ. P. 26(b)(4). Plaintiff disputes that Ms. Wodzinski meets the qualifications of an expert on many grounds and expects to seek exclusion of all or part of her purported expert report or challenge her testimony pursuant to *Daubert* if offered by Defendant as expert opinion. Plaintiff does not, however, dispute that Ms. Wodzinski has personal knowledge regarding certain facts relevant to this case in light of her status as a longtime employee of Defendant.

In addition to public records of bankruptcy filings, Trans Union also receives information concerning bankruptcies in the form of "remarks codes" that are included in information provided by creditors regarding specific credit accounts. Ex. 3, Garst Dep. at 59:9-24. In the credit reporting industry, these creditors are known as "furnishers." *Id.* at 59:16-19, 65:20-24. Furnishers report data on a regular cycle, typically monthly, and provide data in an industry-standard format called "Metro 2". *Id.* at 65:20-66:8. The Metro 2 format has certain established fields in which furnishers can include information about a credit account, including account number, outstanding balance, and details about payment history. Ex. 5. In addition to these fields, furnishers are able to communicate bankruptcy information in a field called the consumer information indicator or "CII" field. Ex. 3, Garst Dep. at 66:12-24; Ex. 5 at BROOKS-TU00001522. Trans Union translates the codes received in the CII field into its own set of internal bankruptcy indicators. Ex. 3 Garst Dep. at 67:20-68:2.

Trans Union's internal codes for bankruptcy indicators are set forth in its "User Guide." Ex. 6 at BROOKS-TU00002538-44; Ex. 7 at BROOKS-TU00014317-23.[6] The User Guide is provided to creditors who both furnish and receive credit data, which spells out the Trans Union's fixed format for communicating credit data so that recipients of credit data understand its meaning. Ex. 9, Deposition of Mary Wang-Chang ("Wang-Chang Dep.") at 47:3-25, 85:18-86:12, 92:25-93:18.[7] Where a bankruptcy remarks code appears on a consumer's file in connection with a tradeline, a consumer report prepared based on that file will include an indication that the account at issue was included in a bankruptcy filing. *See* Ex. 3, Garst Dep. at 44:4-14, 67:22-68:2; Ex. 6 at

---

[6] The same codes and fields are used with respect to data updates provided by furnishers outside of the monthly reporting cycle when provided on an automated universal data form or "AUDF," and also when a furnisher provides information to Trans Union regarding a consumer's dispute. Ex. 3, Garst Dep. at 68:9-70:4.

[7]    Ms. Wang-Chang is a Trans Union employee and testified as one of Defendant's corporate representatives on March 10, 2023.

BROOKS-TU00002538-44; Ex. 7 at BROOKS-TU00014317-23.  Trans Union maintains copies of the credit data communicated to third parties in the form of "fixed format response" or "FFR" records. Ex. 9, Wang-Chang Dep. at 31:22-32:25, 48:4-11,

There is no dispute in this case that these two types of bankruptcy information should go together, and that the appearance of a bankruptcy remark code without a corresponding public record bankruptcy is an "anomaly" that presents an incomplete picture.  Ex. 3, Garst Dep. at 113:5-8; Ex. 4, Wodzinski Dep. at 104:2-24.

**B.    Trans Union's History Of Inaccurate Bankruptcy Reporting**

Trans Union has long been on notice regarding the importance of cross-referencing bankruptcy remarks codes supplied by furnishers with public record bankruptcies, a practice that helps to ensure that Trans Union does not report bankruptcy information regarding an individual for whom Trans Union cannot locate a bankruptcy filed by that person.  This specific scenario was at issue in *Clark v. Trans Union Corporation and Trans Union, LLC*, C.A. No.8:00-1219-22(D.S.C. 2000) ("*Clark*" or the "*Clark* Litigation"), a class action lawsuit that addressed situations where bankruptcy remarks codes were included on a jointly held tradeline where only one of the account holders had filed for bankruptcy.  *See* Ex. 2 (*Clark* Second Amended Stipulation of Settlement) at p. 2.  At the time, Trans Union's default procedures would include bankruptcy remarks in a consumer's file regardless of whether the consumer also had a public record bankruptcy on file.  Ex. 3, Garst Dep. at 27:19-28:4. After several years of litigation, Trans Union ultimately agreed to change its practices in connection with a class action settlement.  Ex. 2.

Specifically, Trans Union committed as a condition of the *Clark*  settlement  not to include on credit reports delivered to third parties after May 31, 2004 "any reference to bankruptcy (regardless of whether the reference to a bankruptcy is signified by words, numbers or codes)" unless there was also a bankruptcy in the public record section of the same report "or Trans Union's

records otherwise indicate that bankruptcy should be reflected for the consumer who is the subject of the Credit Report[.]"  *Id.* at p. 6.  In order to implement this change, Trans Union adopted what became known as the "Clark Rule." Ex. 3, Garst Dep. at 27:10-18, 28:5-7; Ex. 8 at BROOKS-TU00001735-37.  Following a review by Trans Union's data quality committee, the Clark Rule was implemented only with respect to jointly held accounts.  Ex. 3, Garst Dep. at 23:20-21:14.

Even after the Clark Rule, Trans Union continued to assume that bankruptcy remarks codes provided by furnishers regarding individually held accounts are accurate, and did not require the presence of a reportable public record of a bankruptcy on the file in order to report the bankruptcy remarks to third parties. Rather, the Clark Rule applied only to tradelines indicating that they were jointly held or undesignated, as shown by the "ECOA Code" Metro 2 field.  Ex. 3, Garst Dep. at 89:24-90:8. Trans Union has never conducted any studies or audits to determine how accurately furnishers report bankruptcy information.  *Id.* at 117:19-23.

## C.    The Experience Of Plaintiff William Norman Brooks, III

Like the many thousands of consumers he seeks to represent, Plaintiff William Norman Brooks, III has never filed for bankruptcy.  Ex. 10, Declaration of Plaintiff William Norman Brooks, III ("Brooks Decl.") at ¶ 5.  Plaintiff is a longtime Bank of America customer and California resident, who takes pride in maintaining his good credit.  *Id.* at ¶¶ 3-4, 7.  On January 3, 2020, an individual named William *Eugene* Brooks filed a Chapter 13 bankruptcy petition in Alabama federal court (the "Alabama Bankruptcy").  Ex. 11. On or about January 6, 2020, Plaintiff's creditor Bank of America received an inaccurate notification that Plaintiff had filed for bankruptcy, and closed Plaintiff's credit card and line of credit.  Ex. 12; Ex. 13.[8]

---

[8]      Plaintiff commenced separate litigation against both Bank of America and the vendor from which Bank of America obtained the inaccurate bankruptcy notification to address those entities' failures to comply with their independent obligations to Plaintiff pursuant to the FCRA and other law.  These separate instances of noncompliance,

On approximately the same date, Bank of America conducted its usual monthly reporting of tradeline data to Trans Union, and included in its reporting concerning Plaintiff a CII code of "D" indicating that the accounts were included in a Chapter 13 bankruptcy. Ex. 14, Deposition of Danielle Nowlin ("Nowlin Dep.")  at 111:19-112:6;[9] Ex. 15, Declaration of Bank of America employee Neil Patak at ¶ 24.  Pursuant to its standardized procedures in place at the time, Trans Union translated this CII code into its internal code for bankruptcy and included that code in Plaintiff's file, without conducting any cross-check for the presence of a public record bankruptcy filed by Plaintiff.  Ex. 1 at BROOKS-TU000063; Ex. 14, Nowlin Dep.  at 77:5-23, 78:24-79:9.

Plaintiff obtained copies of his file disclosures from each of the Big Three CRAs, including Trans Union, and his Trans Union file disclosure dated January 15, 2020 showed that the tradelines for his Bank of America credit card included bankruptcy remarks.  *Id.* There was no public record of a bankruptcy included in Plaintiff's file.  Ex. 1; Ex. 14, Nowlin Dep. at 81:5-13. Plaintiff promptly disputed, notifying Trans Union that he had not filed for bankruptcy, and provided supporting documentation.  Ex. 16; Ex. 14, Nowlin Dep. at 74:9-75:20.  Plaintiff also separately disputed the bankruptcy remark directly with Bank of America.  Ex. 10, Brooks Decl. at ¶ 10; Ex. 17.  As a result of Plaintiff's efforts, Bank of America directed Trans Union to remove the bankruptcy remarks from the tradeline by placing the code "Q" in the CII field of a standardized update document delivered to Trans Union.  Ex. 18; Ex. 5 at BROOKS-TU00001522.  However, Trans Union took no steps to prevent these inaccurate remarks from being reinserted into Plaintiff's Bank of America tradelines.  Ex. 14, Nowlin Dep. at 136:2-18.

---

and the discovery obtain therefrom, highlighted Trans Union's noncompliance with the FCRA, and do not excuse its independent failure to identify and prevent the reporting of facially inconsistent bankruptcy information concerning Plaintiff described in this brief.

[9]      Ms. Nowlin is an employee of Trans Union and testified as one of Defendant's corporate representatives on January 26, 2023.

And in fact, Bank of America erroneously re-reported the same inaccurate bankruptcy remarks on the same tradelines to Trans Union only weeks later, on or about March 4, 2020. Ex. 19; Ex. 14, Nowlin Dep. at 139:15-140:11. Again, pursuant to its standardized procedure, Trans Union did not cross-check for the presence of a reportable bankruptcy filed by Plaintiff, and instead simply included the same bankruptcy remarks in its file for Plaintiff. Ex. 20; Ex. 14, Nowlin Dep. at 147:20-149:1. On March 11, 2020, Trans Union used this file to publish a consumer report to Plaintiff's prospective creditor, which included this inaccurate bankruptcy information. Ex. 21 at BROOKS0112. Trans Union's internal FFR record memorializing this credit report shows the bankruptcy remarks code on the tradeline, but no bankruptcy in the public record section of the same report. Ex. 22;[10] Ex. 9, Wang-Chang Dep. at 76:1-18.

D.    **The Proposed Class Of Similarly Situated Consumers**

Discovery in this matter has confirmed that Mr. Brooks is not alone in being the subject of a Trans Union report to a third party that included bankruptcy remarks although Trans Union could locate no public record of bankruptcy attributable to him and appropriate for reporting. Records produced in discovery confirm that Trans Union sold 1,492 consumer reports meeting this profile in the month of June 2022 alone. Ex 23 (Trans Union's 4th Suppl. Resp to Pl. Interrogatory 7); Ex. 24, September 2023 Report of Plaintiff's Expert Jonathan Jaffe ("September 2023 Jaffe Report") at ¶ 12.

As of January 31, 2023 (approximately one year after the commencement of this lawsuit), the volume of consumer files in Trans Union's database with a bankruptcy remark but no public record bankruptcy went to zero. Ex. 3, Garst Dep. 39:1-41:9, 46:20-47:17. This happened because

---

[10]    For ease of the Court's review, Plaintiff has highlighted in green the relevant fields of the FFR data for this March 11, 2020 record. *See* Ex. 22 at BROOKS-TU00000463 (showing name, date, and SSN fields), BROOKS-TU00000471 (showing bankruptcy remark WEP); Ex. 6 at BROOKS-TU00002541 (listing WEP as bankruptcy remark). No public record fields denoted by "PR01" appear in the output. Ex. 6 at BROOKS-TU00002418.

Trans Union changed its procedures and began requiring the presence of a public record bankruptcy in a consumer's file before including a bankruptcy remarks code on tradelines in the same file, a change it called the "Clark Rule Expansion."[11] *Id.* Plaintiff therefore seeks to represent a class of consumers spanning approximately 37 months, from January 6, 2020 to the end of January 2023 when Trans Union fully implemented the Clark Rule Expansion across its entire database.

E.    **Objective Records Available For Class Member Identification**

As the Court may recall, early on in the litigation, Trans Union asserted that class members could never be identified through its records and data, and as such, the parties' ability to derive appropriate class data has been the subject of the bulk of discovery taken in this matter. *See*, *e.g.*, ECF 34. Plaintiff and Class Counsel thank the Court for permitting the parties the time to take the detailed discovery necessary to resolve this essential question.  With the benefit of this time, Plaintiff took numerous depositions of Trans Union technical witnesses, obtained targeted and significant electronic data from Trans Union, had that data analyzed by an industry-recognized data expert, and performed public record searches, and has determined with confidence that the Class meets all of the elements of Rule 23, including that class members can be ascertained and identified through objective evidence.

Trans Union initially asserted the FFR records it retains for up to 7 years are purportedly not in a searchable format.  Ex. 23 at p. 2.  Plaintiff took testimony of Trans Union witnesses regarding the basis for these assertions, including details concerning the format and structure of the FFR data and the tools available in Trans Union's systems to identify and extract FFR records

---

[11]    Trans Union first began implementing the Clark Rule Expansion with respect only to new or updated reporting of tradelines in April 2021. Ex. 3, Garst Dep. at 37:6-38:24, 47:4-48:4. Existing files were not updated. *Id.* Although Trans Union considered applying the change to all of its files immediately through a driver, it chose not to do so until January 2023. *Id.*  at 93:2-23; Ex. 27 (indicating that a driver would be needed "eventually").

meeting the class profile.  *See* Ex. 25, March 2023 Declaration of Plaintiff's Expert Jonathan Jaffe ("March 2023 Jaffe Report") at ¶ 10 (summarizing discovery taken related to accessibility of FFR records).  Plaintiff's expert, highly qualified data scientist Jonathan Jaffe, has opined that the existing functionality of computer Trans Union's systems can be used to isolate and extract FFR records meeting the definition of the Tradeline-only Bankruptcy Class as defined in Plaintiff's complaint, using automated queries.  *Id.* at ¶¶ 13-60.  Indeed, Mr. Jaffe testified that a review of FFR records extracted this way could be conducted in a matter of days or weeks.  Ex. 26, Deposition of Jonathan Jaffe ("Jaffe Dep.") at 87:12-88:24, 97:5-16.

In light of Trans Union's assertions concerning the accessibility of FFR records, Plaintiff also pursued identification of relevant records through an alternative means. In addition to FFR, Trans Union maintains "snapshots" of its database of consumer files as it existed on particular dates.  Ex. 3, Garst Dep. at 77:21-78:6 79:8-14, 80:8-83:17.  Trans Union is able to conduct automated queries of these snapshots to identify consumer files meeting particular criteria within these "snapshots." *Id.*; Ex. 23 at pp. 3-4. A Plaintiff's request and to address Trans Union's assertion of burden in producing FFR records, Trans Union identified the total number of consumer credit files which met the profile of Mr. Brooks and the Tradeline-only Bankruptcy Class (a bankruptcy remark on a tradeline but no bankruptcy in the public record section of the same file) in the May 31, 2022 "snapshot," and also in the June 30, 2022 "snapshot." *Id.*  Trans Union then identified the total number of instances in which Trans Union prepared a credit report based upon the contents of those files during the month of June 2022 (e.g., a "hard inquiry").  Ex. 3, Garst Dep. at 84:1-21; Ex. 23 at pp. 4-6.  Trans Union also identified the total number of consumer credit files meeting the same profile that were used to prepare a consumer report in response to a hard inquiry for the months of January 2020 (17,098) and March 2021 (14,816), based on the

"snapshots" representing those time periods. Ex. 23 at p. 5.    Trans Union ultimately produced FFR logs associated with 1,527 hard inquiries from June 2022.  Ex. 23 at pp. 7-8.

Plaintiff provided the June 2022 log records to his expert Mr. Jaffe, who confirmed that the profile of the Tradeline-only Bankruptcy Class exists is present on 95% of the records delivered to third parties. Ex. 24, September 2023 Jaffe Report at ¶ 12.  This confirms that the analysis proposed in the March 2023 Jaffe Report is feasible and repeatable.  Ex. 26, Jaffe Dep. at 100:10-105:17.

The presence or absence of a publicly available bankruptcy record with the same nine-digit social security number ("SSN") as the individual who was the subject of the credit report can be easily and objectively determined through a simple automated search of bankruptcy records on PACER.  Ex.  26, Jaffe Dep. at 126:10-127:6, 148:2-149:7; Ex. 28 (screenshot of PACER search for Plaintiff's full SSN showing no results).  Indeed, according to Plaintiff's review, such a search returns no result for 270 of the 963 unique SSNs present on the FFR records identified by Mr. Jaffe, a rate of 28%.  Ex. 29, Declaration of Lauren KW Brennan ("Brennan Decl.") at ¶ 9; *see also* Ex. 6 at BROOKS_TU00002412 (SSN field in FFR "[l]ists the subject's Social Security number."); Ex. 7 at BROOKS_TU00014168 (same).

For an additional 311 such records (32% of the 963 unique SSNs in the June 2022 data set), the only public record bankruptcy associated with the social security number on the FFR was filed more than 10 years prior to May 30, 2022 and is thus not reportable under Trans Union's own rules. *Id.* at ¶ 10; Ex. 14, Nowlin Dep. at 67:19-68:20.

The analysis already conducted by Trans Union confirms that the volume of hard inquiries reflecting the profile of the Tradeline-only Bankruptcy Class was substantially higher prior to the gradual rollout of the Clark Rule Expansion in 2021; for example, in January 2020 there were

17,098 hard inquiries against such files, and 14,816 in March 2021.  Ex. 23 at pp. 5-6. As such, a search of PACER records based on SSNs available in FFR records of hard inquiries meeting the Tradeline-only Bankruptcy Class profile can be expected to return no results at similar rate to the 28% found in Plaintiff's review of the June 2022 FFR data.  Ex. 29, Brennan Decl. at ¶ 9.  Plaintiff therefore expects to identify approximately 4,700 additional FFR records for the month of January 2020 and 4,100 for March 2021 which meet the same profile as the 270 identified in the June 2022 data: no public record bankruptcy on PACER.  Plaintiff likewise expects a correspondingly high volume for the other 13 months in the class period before Trans Union began applying the Clark Rule Expansion in April 2021.  Based upon the 32% incidence in the June 2022 data, Plaintiff also expects to identify at least 5,400 records from January 2020 for which the only bankruptcy located on PACER predates the FFR record by more than 10 years, and approximately 4,700 such records from March 2021. *See* Ex. 23; Ex. 29 at ¶ 10.

Therefore, even after records for consumers who had multiple hard inquiries during the class period are deduplicated, the class plainly numbers in the tens of thousands.

### III.  <u>ARGUMENT</u>

### A.  <u>Legal Standards Governing Class Certification</u>

The United States Supreme Court has noted that "[c]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Barnard*, 452 U.S. 89, 99 (1981).  "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiff's and counsel's ability to fairly and adequately protect class interests." *In re Prudential Ins. Co. Am. Sales Prac. Litig.*, 148 F.3d 283, 308 (3d. Cir. 1998).

Plaintiff must establish each of the four threshold requirements of subsection (a) of Rule 23, namely: "numerosity," "commonality," "typicality," and "adequate representation."

*Montgomery Cty., Pa. ex rel. Becker v. MERSCORP, Inc.*, 298 F.R.D. 202, 209 (E.D. Pa. 2014) (quoting FED. R. CIV. P. 23(a)). Plaintiff must also show that this action qualifies for class treatment under at least one of the subdivisions of Rule 23(b). *See Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 183 (3d Cir. 2001). Under Rule 23(b)(3), a class action will be appropriate where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).

Plaintiff bears the burden of establishing each element of Rule 23 by a preponderance of the evidence. *In re Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 320 (3d Cir. 2008). Once a plaintiff has demonstrated a preliminary legal showing that the requirements of Rule 23 have been met, the burden of proof is upon the defendant to demonstrate otherwise. 2 H. Newberg, NEWBERG ON CLASS ACTIONS (4th ed. 2002) ("NEWBERG") §7.22 at 70-71.

The district court must conduct a "rigorous analysis" of the evidence and arguments in making the class certification decision. *In re Hydrogen Peroxide Lit.,* 552 F.3d at 318. That said, a district court "may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, *but not* in order to determine whether the individual elements of each claim are satisfied." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d. Cir. 2011) (emphasis added).

The determinations called for by Rule 23 are questions addressed to the sound discretion of the district court. *Gulf Oil Co.*, 452 U.S. at 100. A decision to grant class certification is not a final order; it may be altered or amended as the case progresses towards resolution on the merits. FED. R. CIV. P. 23(c)(1)(C).

1.    **The Requirements of** FED. R. CIV. P. 23(a)

Rule 23(a) establishes four prerequisites for the maintenance of a class action:

(a)    The class is so numerous that joinder of all members is impracticable;

(b)    There are questions of law or fact common to the class;

(c)    The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(d)    The representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  Each of these requirements is met here.

a.    *Numerosity*

Rule 23(a)(1) of the Federal Rules of Civil Procedure requires that the class be "so numerous that joinder of all members is impracticable."  *Weiss v. York Hosp.*, 745 F.2d 786, 808 (3d Cir. 1984).  The Third Circuit has held that generally a class with more than 40 will satisfy the numerosity requirement.  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

Here, discovery indicates that the class numbers in then tens of thousands, as detailed above.  Plaintiff himself has already identified 581 individuals meeting the class definition from the June 2022 FFR records alone.  Ex. 29.  Applying the same rate of class membership to the June 2020 data already supplied indicates that a full review of FFR will show more than 10,000 records meeting the same profiles - over 4,700 with no bankruptcy found on PACER, based on 28% of 17,098,  and another 5,400 with only outdated filings based on 32% of 17,098)  *See* Ex. 23; Ex. 29 at ¶¶ 9-10.  Applying the same rates to the March 2021 data is expected to yield over 4,100 records with no bankruptcy found on PACER (28% of 14,816) and over 4,700 with only outdated filings (32% of 14,816).  *Id.*  Even conservatively estimating that full review will show 8,000 records meeting the class definition per month between January 2020 and April 2021, and 500 per month

(consistent with the June 2022 data) from May 2022 to January 2023, the class unquestionably numbers in the tens of thousands.

As an additional requirement, our Court of Appeals has held that membership in the class, *vel non,* must be "currently and readily ascertainable based on objective criteria." *City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 439 (3d Cir. 2017). "[A]t the certification stage, the plaintiff need not identify the actual class members. She need only show how class members *can* be identified." *Boyle v. Progressive Specialty Ins. Co.*, 326 F.R.D. 69, 83 (E.D. Pa. 2018) (citing *City Select*). A class meets the ascertainability standard even where it involves a multi-step process, consultation of multiple sources of information, or even a file-by-file review process. *Kelly v. RealPage, Inc.*, 47 F.4th 202, 222-25 (3d Cir. 2022).

As detailed above, objective criteria derived from Defendant's own records and publicly available court records can be use the ascertain class membership. Trans Union maintains a record of the consumer reports it sells to third parties in the form of standardized FFR records. Ex. 9, Wang-Chang Dep. at 31:22-32:25, 47:3-25, 48:4-11, 85:18-86:12, 92:25-93:18; Ex. 6 at BROOKS-TU00002538-44; Ex. 7 at BROOKS-TU00014317-23. These FFR records demonstrate on their face whether a consumer report delivered to a third party meets the same profile as Trans Union's inaccurate reporting about Plaintiff: the inclusion of a tradeline with bankruptcy remarks, but no bankruptcy in the public record section of the report. Ex. 22. These FFR records are maintained in searchable electronic format, and can be quickly reviewed through computerized means to confirm that they meet the class profile. Ex. 25, March 2023 Jaffe Report at ¶¶ 12-18; Ex. 24, September 2023 Jaffe Report at ¶ 12; Ex. 26, Jaffe Dep. at 87:12-88:24, 97:5-16.

The FFR records also contain detailed personal identifiers including consumers' names, addresses, dates of birth, and SSNs which can be used to confirm whether a bankruptcy filing

bearing the same identifiers exists and whether it was reportable under FCRA rules. *See, e.g.* Ex. 22; Ex. 29, Brennan Decl. at ¶¶ 8-10. This plainly satisfies the "ascertainability" requirement set forth by the Third Circuit. *See Kelly*, 47 F.4th at 224 (harmonizing Third Circuit case law on ascertainability); *McIntyre v. RealPage, Inc.*, 336 F.R.D. 422, 433 (E.D. Pa. 2020) (class was ascertainable where it could be identified through comparison of CRA's records and court dockets).

      b.   *Commonality*

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class." Satisfaction of the commonality requirement requires that plaintiffs demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551 (2011). "Commonality does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston,* 265 F.3d at 184 (internal quotation marks omitted); *see also Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 597–98 (3d Cir. 2012).

Here, the common questions are (a) whether Defendant's procedure of selling consumer reports which include bankruptcy remarks codes on tradelines even where the consumer's file does not include a corresponding public record bankruptcy is reasonable under section 1681e(b) of the FCRA; and (b) whether any violation of FCRA section 1681e(b) was negligent or willful. These common issues mirror those in FCRA cases in which several other courts have found commonality satisfied. *McIntyre*, 336 F.R.D. at 434-35 (certifying FCRA section 1681e(b) class action addressing inaccurate reporting of public record information); *Miller v. Trans Union, LLC*, No.

3:12-cv-1715, 2017 WL 412641, at *8-11 (M.D. Pa. Jan. 18, 2017) (report and recommendation certifying FCRA statutory damages case for class treatment); *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D 183, 201-02 (E.D. Va. 2015) (finding commonality satisfied on the following subjects: "the inaccuracy of the consumer reports, the reasonableness of the procedures alleged to cause these inaccuracies, whether Equifax's conduct was willful, and the determination of statutory damages."). The commonality element of Rule 23(a) is satisfied here.

   c. *Typicality*

  Rule 23(a)(3) requires that the claims of the named plaintiff be typical of the claims of the class. *MERSCORP,* 298 F.R.D. at 211; *McCall v. Drive Fin. Servs., L.P.*, 236 F.R.D. 246, 250 (E.D. Pa. 2006). A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. *In re Nat'l Football League Players Concussion Injury Litig.,* 821 F.3d 410, 428 (3d Cir. 2016). Typicality is a "low threshold." *Id.* The typicality requirement may be satisfied even if there are some factual distinctions between the claims of the named Plaintiff and those of other class members. *Id.*

  The measure of whether a plaintiff's claims are typical is whether the nature of plaintiff's claims, judged from both a factual and a legal perspective, are such that in litigating her personal claims she can reasonably be expected to advance the interest of absent class members. *Scott v. University of Delaware*, 601 F.2d 76, 84 (3d Cir. 1979). *See also In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 139 (D.N.J. 1984) (citing NEWBERG) (the majority of class action decisions have held that typicality is satisfied when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented).

Here, Mr. Brooks's claim is entirely typical. Defendant prepared a consumer report about him containing a bankruptcy remark on a tradeline, without a corresponding public record of a bankruptcy, and communicated this contradictory and inaccurate result to a third party. Ex. 22; Ex. 21 at Brooks 0112; Ex. 28. The same is true for all members of the proposed class.  Mr. Brooks intends to seek uniform statutory damages under FCRA section 1681n for himself and other class members.  Defendant's failure to "assure" the "maximum possible of accuracy" in its reporting of bankruptcy information is exactly the claim of every class member.  As in most cases, the low threshold of typicality is satisfied here.

### d.    *Adequate Representation*

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class."  "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'"  *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)).  "The second factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.'"  *Id.* (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004)).

Both prongs of the "adequacy" test are met here.  First, Plaintiff has retained counsel with decades of experience in class action litigation to prosecute this case. FMS was founded in 1998 and has concentrated its practice in consumer protection litigation ever since. Within that more general practice area, FMS has a particular emphasis in Fair Credit Reporting Act ("FCRA") litigation and consumer class actions.  FMS has been certified as class counsel in over 70 cases,

achieved a ground-breaking verdict in an FCRA class action, and has been specifically recognized for its expertise in FCRA litigation and the high caliber of its work for the classes it represents by federal courts all over the country. *See White v. Experian Info. Solutions, Inc.*, 993 F. Supp. 2d 1154, 1169, 1172 (C.D. Cal. 2014), *aff'd sub nom. Radcliffe v. Experian Info. Solutions, Inc*., 818 F.3d 537, 548 (9th Cir. 2016) (finding FMS "FCRA specialists" and appointing firm and its team as interim class counsel over objections from a competing national law firm (Boies Schiller) because their team's "credentials and experience [we]re significantly stronger in class action and FCRA litigation."); *See McIntyre v. RealPage, Inc.,* 2023 WL 2643201, at *3 n.5 (E.D. Pa. Mar. 23, 2023) (referencing FMS's "significant experience litigating FCRA class actions" and "particular skill and efficiency" in prosecuting FCRA section 1681e(b) class action, as well as "counsel's overwhelming experience in consumer litigation and class actions"); *Ramirez v. Trans Union, LLC*, 2022 WL 17722395 (N.D. Cal. Dec. 15, 2022) ("Courts have consistently recognized Francis Mailman Soumilas 'for its expertise in FCRA litigation and the high caliber of its work for the classes it represents.'"); *Martinez v. Avantus, LLC,* 343 F.R.D. 254, 266 (D. Conn.  2023) (firm "has substantial experience in class action litigation, including FCRA class actions … [and] demonstrated proficiency at all stages of suit"); *Der Hacopian v. SentryLink*, C.A. 18-3001 (D. Md. Nov. 23, 2020) (firm "many, many times in the past has been found to be not just qualified or competent, but extremely well-qualified and competent to represent consumer classes in many, many other jurisdictions, not only this particular jurisdiction"); *see also Patel v. Trans Union, LLC*, 308 F.R.D. 292, 307 (N.D. Cal. 2015) (noting counsel have "extensive experience in litigating [FCRA cases] … have represented consumer classes in many cases in many districts … [and] have shown their proficiency in this case[.]"); *Barel v. Bank of America*, 255 F.R.D. 393, 398-99 (E.D. Pa. 2009) (finding firm "competent, experienced and well-qualified to prosecute class actions" and

noting that class counsel "have done an excellent job in representing the class in the instant litigation."). *See* Ex. 30 (FMS firm biography). *See also* Ex. 31 (Declaration of Tammy Hussin).

Moreover, as set forth above, FMS was appointed as class counsel in a highly contested appointment challenge in a national class against all 3 CRAs involving their bankruptcy reporting practices over the highly esteemed firm of Boies Schiller. *See White*, *supra*. Thus, in addition to its usual experience and expertise in FCRA litigation, FMS has experience in the precise subject matter.

Furthermore, adequacy is presumed and any challenge to adequacy is for Defendant to prove. *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982). Mr. Brooks asserts there is no conflict or antagonism of interests and has amply fulfilled his role as the class representative. *See, e.g.* Ex. 10, Brooks Decl. at ¶¶ 2, 14-15. Accordingly, Mr. Brooks adequately represents the interests of the class.

### 2.    The Requirements of FED. R. CIV. P. 23(b)

In addition to meeting the prerequisites of Rule 23(a), an action must satisfy at least one of the three conditions of subdivision (b) of Rule 23. Plaintiff proceeds here under Rule 23(b)(3), which provides, in pertinent part, that "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition[,] the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members[.]" FED. R. CIV. P. 23(b)(3). To determine this level of cohesion, "the predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." *Taha v. Cty. of Bucks*, 862 F.3d 292, 308–09 (3d Cir. 2017).

Common issues predominate over individual issues where plaintiffs have alleged a common course of conduct on the part of a defendant. *Prudential*, 148 F.3d at 314-15. Particularly, predominance is established where common facts about the willfulness of a defendant's conduct provide for a statutory damage remedy. *Taha,* 862 F.3d at 309.

Even more particularly, courts have regularly found that common issues are more likely to predominate in an FCRA class action seeking only statutory damages. *Stillmock v. Weis Mkts., Inc.*, 385 Fed. App'x. 267, 273 (4th Cir. 2010) (reversing denial of certification of class seeking FCRA statutory damages, holding that "overarching issue by far is the liability of the defendant's willfulness"); *McIntyre*, 336 F.R.D. at 438 (finding predominance satisfied because the claims centered on the CRA's standardized "policy, practice, or procedure that, effectively, produces the same result – the generation of inaccurate reports"); *Gillespie v. Equifax Info. Servs., LLC*, No. 05-cv-138, 2008 WL 4614327, at *7 (N.D. Ill. Oct. 15, 2008) (certifying FCRA class action for statutory damages, finding that the predominant common issue was whether the defendant's standardized practice constituted a knowing or reckless disregard for statutory obligations); *Miller*, 2017 WL 412641, at *8-11; *Chakejian v. Equifax Info. Servs., LLC*, 256 F.R.D. 492, 498, 500-01 (E.D. Pa. 2009) (certifying FCRA statutory damages class action); *Summerfield v. Equifax Info, Servs. LLC*, 264 F.R.D. 133, 139, 142 (D.N.J. Sept. 30, 2009) (same).[12]

Here the success or failure of the Plaintiff's claim and that of the class will depend upon the same core evidence and legal issues: evidence regarding Trans Union's practices for gathering bankruptcy records and determining whether they pertain to a particular consumer, and its

---

[12] *See also Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 392 (N.D. Ill. 2006) (certifying a class under the FCRA and rejecting defendant's argument that damages were an individual issue as "a nonstarter" because the class sought only statutory damages, and class members with actual damages could opt out); *Murray v. New Cingular Wireless Services, Inc.*, 232 F.R.D. 295, 302 (N.D. Ill. 2005) (certifying a class under the FCRA and noting "since the class is requesting statutory as opposed to actual damages, the existence of individual damages is not a barrier to class certification").

standardized failure to resolve the facial conflict between the appearance of a bankruptcy remark on a tradeline in a file that does not contain a public record of a bankruptcy; Trans Union's knowledge of problems with the reporting of bankruptcy records in light of past litigation including *Clark*; whether Defendant's failure to assure accuracy for Plaintiff and the class was willful, or merely negligent, and other common fact and legal issues readily demonstrate that this trial for statutory damages of $100-$1,000 per class member can be tried with common evidence. *Taha,* 862 F.3d at 309; *McIntyre*, 336 F.R.D. at 438-39; *see also Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *6 (N.D. Cal. Nov. 7, 2017) (jury verdict for statutory damages of $8 million for class members upheld in full post-trial).

In addition to finding the predominance of common questions, Rule 23(b)(3) also requires that the Court determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." It has been widely recognized that a class action is superior to other available methods – particularly, individual lawsuits – for the fair and efficient adjudication of a suit that affects a large number of persons injured by violations of consumer protection laws or common law. *Prudential*, 148 F.3d at 316; *McIntyre*, 336 F.R.D. at 439; *Serrano v. Sterling Testing Sys., Inc.,* 711 F. Supp. 2d 402, 413 (E.D. Pa. 2010). Consumer class actions such as the case at bar easily satisfy the superiority requirement of Rule 23. *See Serrano*, 711 F. Supp. 2d at 413; *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 626 (E.D. Pa. 1994) (public interest in seeing that rights of consumers are vindicated favors disposition of claims in a class action).

Likewise, the superiority requirement is satisfied here. Defendant has violated the rights of large number of geographically dispersed persons to such an extent that the cost of pursuing individual litigation to seek recovery against a well-financed adversary is not feasible. Thus, the

alternatives to a class action are either no recourse for thousands of consumers, or even in the unlikely event that they all become aware of their rights and could locate counsel, a multiplicity of scattered suits resulting in the inefficient administration of litigation. The common and predominating factual and legal issues noted above mean this matter is capable of efficient, class-wide adjudication on the merits. Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this matter.

This class action would be easily manageable. Only statutory damages, not individual actual damages, will be sought. This case presents no manageability difficulties that would preclude class certification.

### B.    Appointment and Approval of Class Counsel Is Warranted

As previously addressed above, Plaintiff has chosen counsel with extensive experience in handling FCRA and consumer class actions. Plaintiff submits that his counsel should be designated as Class Counsel. *See* Exs. 30-31.

### C.    Plaintiff's Trial Plan

In *Wachtel v. Guardian Life Insurance Co. of America*, the Third Circuit, finding itself in "uncharted waters," considered a matter of first impression under the amendments to Rule 23 which were effective December 1, 2003. 453 F.3d 179, 184 (3d. Cir. 2006). Specifically, the Court addressed the provisions of Rule 23(c)(1)(B), which states "An order certifying a class action must define the class and the class claims, issues or defenses[.]" Fed. R. Civ. P. 23(c)(1)(B). The Court concluded that the plain text of Rule 23(c) as amended now:

> [R]equires more specific and more deliberate treatment of the class issues, claims and defenses than the practice described above has usually reflected. More specifically, in our review, the proper substantive inquiry for an appellate tribunal reviewing a certification order for Rule 23(c)(1)(B) compliance is whether the precise parameters defining the class and a complete list of the claims, issues, or defenses to be treated on a class basis are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion.

*Wachtel*, 453 F.3d at 185. The Court summarized its holding as follows:

> In summary, we hold that the requirement of Rule 23(c)(1)(B) that a certification order "define the class and the class claims, issues, or defenses," means that the text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issue or defenses to be treated on a class basis.

*Id.* at 187-88.

In addition, the Court of Appeals addressed the practice of submitting a "trial plan" that could be used to facilitate Rule 23(c)(1)(B) compliance. While stopping short of requiring such a plan in every case, the *Wachtel* court expressed its belief that the pre-certification presentation of a trial plan is "an advisable practice within the class action arena." *Id*. at 188, n. 7.

Plaintiff's proposed class certification Order has been drafted to comply with the requirements of Rule 23(c)(1)(B) that the class and class claims and issues be specifically defined, in light of *Wachtel*'s comment that a "sufficient certification order must, in some clear and cogent form, define the claims, issue or defenses to be treated on a class basis[.]" *Id*. at 187-88.

Further, while a trial plan is not a mandated component of a motion for class certification, *Wachtel* considers such a plan an advisable practice. As such, Plaintiff proposes the following for the Court's consideration:

1.  Plaintiff will present his individual case.

2.  Unless a directed verdict is appropriate at the close of Plaintiff's individual presentation, his individual case will be presented to the jury for determination.

3.    Plaintiff's cause of action is for violation of a discrete section of the FCRA.

4.    The jury will be asked to determine whether Defendant failed to assure maximum possible accuracy in its reporting of bankruptcy information on the consumer reports sold about Plaintiff and the class, and whether that violation was willful, *i.e.,* is in reckless disregard of consumer FCRA rights.

5.    If the jury returns a verdict against Plaintiff, the trial will end and judgment against Plaintiff and the class will be entered for statuary damages. If the jury finds for Plaintiff, the Court can render a judgment for the class based on the jury findings.

6.    Final judgment will be based upon the jury verdict.

As shown by the above, trial of this class action will be relatively straightforward. A similar FCRA class action trial for statutory damages against a CRA involving inaccurately reported government list public records and an FCRA section1681e(b) claim lasted eight days in total and was entirely manageable. *Ramirez v. Trans Union, LLC*, No. 12-cv-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017) (upholding verdict rendered after weeklong trial in FCRA class action) *aff'd*, *Ramirez v. TransUnion, LLC*, No. 17-17244, 2020 WL 946973 (9th Cir. Feb. 27, 2020) (class certification finding and liability and statutory damages verdict upheld, and also punitive damages were upheld but reduced to 4:1 ratio). This FCRA section 1681e(b) case can also be maintained and prosecuted to judgment as a class action.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant this motion and enter the proposed order submitted herewith.

Dated: February 2, 2024

Respectfully submitted,

WILLIAM NORMAN BROOKS, III, *by his attorneys*,
*/s/James A. Francis*
James A. Francis, Esq.
Lauren KW Brennan, Esq.
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(T) 215-735-8600
(F) 215-940-8000
jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Tammy Hussin
**Hussin Law Firm**
1596 N. Coast Hwy 101
Encinitas, CA 92024
(T) 877-677-5397
(F) 877-667-1547
Tammy@HussinLaw.com