**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WILLIAM NORMAN BROOKS, III,

      *Plaintiff,*

    v.

TRANS UNION, LLC,

      *Defendant.*

Civil Matter No. 2:22-cv-00048-GEKP

---

**DEFENDANT TRANS UNION LLC'S BRIEF IN**
**OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Michael O'Neil *(pro hac vice)*
Albert E. Hartmann *(pro hac vice)*
Kristen A. DeGrande *(pro hac vice)*
**REED SMITH LLP**
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
T: 312-207-1000
E: michael.oneil@reedsmith.com
E: ahartmann@reedsmith.com
E: kdegrande@reedsmith.com

Joshua M. Peles
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
T: 215-851-8100
E: jpeles@reedsmith.com

*Attorneys for Defendant Trans Union LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  FACTUAL BACKGROUND ..............................................................................2

   A.   Plaintiff's Claim.........................................................................................2

   B.   Plaintiff's Abandonment of Seven Class Claims and Revision of
        Definition of Class Whose Certification Plaintiff Seeks...........................5

   C.   Plaintiff's Various Evolving Theories of How to Identify a Class of
        Consumers Whom Trans Union Inaccurately Reported as Filing for
        Bankruptcy. ...............................................................................................6

        1.   Plaintiff's failed efforts to devise a method for identifying possible
             class members. .................................................................................6

             a.   The parties cooperative, albeit unsuccessful, efforts to
                  identify class members. ..........................................................6

             b.   Plaintiff's claim that Trans Union can use the "existing
                  functionality" of its systems to identify credit reports of
                  possible class members. ...........................................................9

             c.   Plaintiff's estimates of how long it would take to identify
                  class members.........................................................................10

        2.   Trans Union's uncontradicted opinions regarding unreliability of
             the lack of public record in credit report to prove inaccurate
             bankruptcy remark............................................................................11

        3.   Plaintiff's new proposal to search PACER records for public
             records, and Trans Union's testing of it...........................................15

III. ARGUMENT .......................................................................................................17

   A.   Governing Rule 23 Standards and Burdens of Proof...........................17

   B.   Plaintiff's Cursory Commonality Argument Fails. ...............................19

   C.   Individualized Issues Predominate Over Common Questions. ............20

        1.   The predominance inquiry must start with the elements of the
             claim. ................................................................................................20

        2.   Plaintiff's predominance argument fails ..........................................22

        3.   The need for individualized proof that each class member's
             inaccurate credit report was inaccurate defeats a finding of
             predominance. ..................................................................................23

        4.   Plaintiff does not intend to introduce trial evidence of class-
             member inaccuracy...........................................................................25

D.    Lack of Common Evidence of Inaccuracy Precludes the Necessary
Determination of Superiority.............................................................27

E.    Ascertaining Class Membership is Not Administratively Feasible. ....................28

1.    The Third Circuit's 'heightened ascertainability" test. ............................28

2.    Plaintiff cannot demonstrate that ascertaining class membership is
administratively feasible. .........................................................31

IV.    CONCLUSION ...........................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Ollie's Bargain Outlet, Inc.*,
   37 F.4th 890 (3rd Cir. 2022) ............................................................................................19

*Berkery v. Equifax Info. Servs.*,
   429 F. Supp. 3d 24 (E.D. Pa. 2019) (Pratter, J.) ..............................................................21

*Bibbs v. Trans Union LLC*,
   43 F.4th 331 (3d Cir. 2022) ..............................................................................................21

*Blain v. SmithKline Beechem Corp.*,
   240 F.R.D. 179 (E.D. Pa. 2007).........................................................................................28

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...........................................................................................................30

*Carrera v. Bayer Corp.*,
   727 F.3d 300 (3d Cir. 2013) ..............................................................................................35

*City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*,
   867 F.3d 434 (3d Cir. 2017) ..............................................................................................34

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................................................20

*Cortez v. Trans Union, LLC*,
   617 F.3d 688 (3d Cir. 2010) .....................................................................................2, 3, 21

*Crane v. Trans Union, LLC*,
   282 F. Supp. 2d 311 (3d Cir. 2003).....................................................................................21

*Danvers Motor Co. v. Ford Motor Co.*,
   543 F.3d 141 (3d Cir. 2008) ..............................................................................................27

*Davis v. Screening*,
   No. 22-2468, 2024 U.S. Dist. LEXIS 15735 (E.D. Pa. Jan. 30, 2024) ..................................21

*Dean v. CVS Pharm., Inc.*,
   No. CV 14-2136, 2018 U.S. Dist LEXIS 138633 (E.D. Pa. Aug. 16, 2018) ........................18

*In re Domestic Drywall Antitrust Litig.*,
   No. 13-MD-2437, 2017 U.S. Dist. LEXIS 135758 (E.D. Pa. Aug. 24, 2017) ......................29

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ...........................................................................................................20

*Farmer v. Phillips Agency, Inc.*,
  285 F.R.D. 688 (N.D. Ga. 2012)...........................................................................25

*Ferreras v. Am. Airlines, Inc.*,
  946 F.3d 178 (3d Cir. 2019) ........................................................................23, 24

*Garcia v. Equifax Info. Servs., LLC*,
  No. 2:17-cv-03123-JAD-VCF, 2020 U.S. Dist. LEXIS 252995 (D. Nev.
  March 23, 2020)....................................................................................................25

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) .............................................................................................18

*Gomez v. Kroll Factual Data, Inc.*,
  No. 13-cv-0445-WJM-KMT, 2014 U.S. Dist. LEXIS 51303 (D. Colo. Apr.
  14, 2014)...............................................................................................................25

*Gonzalez v. Owens Corning*,
  885 F.3d 186 (3d Cir. 2018) ................................................................................18

*Hargrove v. Sleepy's LL*,
  974 F.3d 467 (3d Cir. 2020) ..........................................................................28, 30

*Harnish v. Widener Univ. Sch. of Law*,
  833 F. 3d 298 (3d Cir. 2016) ....................................................................18, 22, 29

*Harper v. Trans Union, LLC*,
  No. 04-3510, 2006 U.S. Dist. LEXIS 91813 (E.D. Pa. Dec. 20, 2006) ..........24, 28

*Hayes v. Wal-Mart Stores, Inc.*,
  725 F.3d 349 (3d Cir. 2013) ..........................................................................20, 29

*Henderson v. Corelogic Nat'l Background Data, LLC*,
  No. 12-0097, 2016 U.S. Dist. LEXIS 119442 (E.D. Va. Sept. 2, 2016).................25

*Huber v. Simon's Agency, Inc.*,
  84 F.4th 132 (3d Cir. 2023) .................................................................................23

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ..............................................................17, 18, 19, 20

*Johnston v. HBO Film Mgmt., Inc.*,
  265 F.3d 178 (3d Cir. 2001) ..........................................................................18, 27

*Jones v. RealPage, Inc.*,
  No. 19-2087, 2020 U.S. Dist. LEXIS 251189 (N.D. Tex. Jan. 27, 2020).............25

*Kelly re RealPage, Inc.*,
    47 F. 4th 202 (3rd Cir. 2022) ..............................................................30

*Klotz v. Trans Union, LLC*,
    246 F.R.D. 208 (E.D. Pa. 2007) ..........................................................24

*Krajewski v. Am. Honda Fin. Corp.*,
    557 F. Supp. 2d 596 (E.D. Pa. 2008) ....................................................21

*In re Lamictal Direct Purchaser Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020) ........................................... 18, 20, 21, 22

*In re LifeUSA Holding*,
    242 F.3d 136 (3d Cir. 2001) ................................................................27

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ............................................... 20, 29, 30

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*,
    259 F.3d 154 (3d Cir 2001) ............................................... 18, 20, 27

*In re Niaspan Antitrust Litig.*,
    67 F. 4th 118 (3rd. Cir. 2023) ....................................................*passim*

*Owner-Operator Indep. Drivers Ass'n, Inc v. USIS Com. Servs., Inc.*,
    537 F.3d 1184 (10th Cir. 2008) ..........................................................24

*Philbin v. Trans Union Corp.*,
    101 F.3d 957 (3d Cir. 1996) ..........................................................3, 21

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) ..........................................................20, 28

*In re The Prudential Ins. Co. of Am. Sales Practices Litig.*,
    148 F.3d 283 (3d Cir. 1998) ................................................................20

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ............................................................................24

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ..........................................................27

*Wachtel v. Guardian Life Ins. Co. of Am.*,
    453 F.3d 179 (3rd Cir. 2006) ..............................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................. 19, 23, 26

*Wilson v. First Advantage Background Servs. Corp.*,
  No. 21-cv-06071-SRB, 2023 U.S. Dist. LEXIS 157930 (W.D. Mo. July 28,
  2023)................................................................................................................................24

**Statutes**

15 U.S.C. § 1681e(b)..........................................................................................................2

15 U.S.C. § 1681s-2(a)(1)(A)............................................................................................3

**Rules**

Fed.R.Civ.P. 23(b)(3)..................................................................................................20, 27

Fed.R.Civ.P. 23(c)(1)(A)............................................................................................26, 28

**Regulations**

12 C.F.R. § 1022.42(a)......................................................................................................3

Defendant Trans Union LLC ("Trans Union"), by and through its undersigned counsel, hereby submits its brief in opposition to Plaintiff's Motion for Class Certification (ECF 43) ("Motion").

## I.    INTRODUCTION

Two years after first filing this lawsuit, which contends that Trans Union LLC inaccurately reports that a consumer's credit account is in bankruptcy when that credit report does not also contain a public record bankruptcy. Plaintiff has moved pursuant to Rule 23 for class certification. That motion abandons seven (7) of the eight (8) classes alleged in his Amended Complaint and seeks only certification of a modified class.

As reflected in several stipulated orders, the parties jointly sought several extensions of time for Plaintiff to file his Rule 23 motion, from September 2022 to February 2, 2024. Those joint stipulations explained that Trans Union had never attempted to undertake the massive review of archived raw data reflecting approximately 2.9 billion credit reports issued over three (3) years, to find those that Plaintiff contends can be used to identify putative class members. Those extensions also extended the deadline for Plaintiff's "data scientist" opinion witness to develop and test methods for such data extractions.  However, ultimately, he failed to do so.

Equally problematic for Plaintiff is his 11th-hour realization that his long-held theory for why the bankruptcy remarks on accounts were inaccurate on a class-wide basis failed. Trans Union disclosed the opinions of its 20-year employee responsible for the computer algorithms used by Trans Union to match credit account and public records from third parties to existing credit files. In great detail, that witness explained the rare instances in which incoming data could not be matched to the primary file relating to a consumer. She also reviewed all the Trans Union data relating to a sample of putative class members, and discovered that, for more than half those 50 consumers, other Trans Union files contained the public record bankruptcy. Based

on her opinions, a review of PACER court records found 19 bankruptcy filings by the 26 consumers that Trans Union's data could not locate.

Therefore, by his Motion, Plaintiff pivots to a new method for proving what bankruptcy remarks of the originally-defined class were inaccurate. However, aside from creating the need for thousands and thousands of individualized fact determinations that defeat class certification, that newly-proposed method has been proven erroneous and unreliable on these facts.

As detailed herein, Trans Union argues that Plaintiff's Motion should be denied for any one of four reasons, i.e., Plaintiff's failure to prove four essential elements of Rule 23(a) and Rule 23(b)(3), i.e., commonality, predominance, superiority, and ascertainability.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Claim.

By his First Amended Class Action Complaint (ECF 13) (the "Amended Complaint"), Plaintiff asserts claims against Trans Union for multiple alleged FCRA and related California statutory violations. (Am. Cmplt., *passim*.) However, by his Rule 23 motion, Plaintiff only seeks to certify a single, albeit modified, class for Trans Union's alleged violation of Section 1681e(b) of the FCRA. (Mem. of Law in Supp. of Pl.'s Mot. for Class Certification (ECF 43-1) ("Mem.") at 10 & n.3.)[1]

Under Section 1681e(b), when preparing "consumer reports," e.g., credit reports, "consumer reporting agencies," or "CRAs," (like Trans Union) must use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). To prevail on a Section 1681e(b) claim, the plaintiff must prove that the CRA reported inaccurate information to a third party. *See Cortez v. Trans*

---

[1] All pin-citations to the Memorandum of Law in Support of Plaintiff's Motion for Class Certification herein are to the corresponding ECF document number.

*Union, LLC*, 617 F.3d 688, 708 (3d Cir. 2010) (citing *Philbin v. Trans Union Corp.*, 101 F.3d

957, 963 (3d Cir. 1996).) However, even if it reports such inaccurate information, a CRA is not

strictly liable. Instead, a CRA can avoid liability for reporting inaccurate information if it

employed the FCRA-required "reasonable procedures." *See Cortez*, 617 F.3d at 708.[2]

     Plaintiff—citing to his sworn declaration—explains that he has never filed for

bankruptcy. (Mem. at 14 (citing Pl. Ex. 10 (Declaration of William Norman Brooks, III in

Support of His Motion for Class Certification) (ECF 43-12) ("Brooks Decl.") at ¶ 5).)[3] A

different William Brooks—whose Social Security Number ("SSN") ends in the same last four

digits as Plaintiff's—filed for bankruptcy in Alabama on January 3, 2020. (Mem. at 14.)

     At the time, Plaintiff had both a credit card and a home equity line of credit with Bank of

America. Bank of America has numerous robust policies and procedures to monitor for

bankruptcy filings by its customers. One of these procedures is contracting with a third party,

Lundquist Consulting, Inc. ("LCI"), to monitor bankruptcy filings and alert Bank of America

when one of its customers potentially files for bankruptcy. (Pl. Ex. 15 (Declaration of Neil Patak

In Support of Defendant's Opposition to Plaintiff's Motion for Class Certification) (ECF 43-17)

("Patak Decl.") at ¶¶ 5-17.)[4] Here, in January 2020, LCI (erroneously) reported to Bank of

America that a William Brooks with the same full nine-digit SSN as Plaintiff had filed for

bankruptcy. (*Id.* at ¶ 23.) Due in part to the bank's legal inability to collect on accounts in

---

[2] The FCRA also imposes accuracy-related duties on entities that provide credit information to CRAs, known as "furnishers." For example, a furnisher is prohibited from providing information to CRAs if it "knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A); *see also* 12 C.F.R. § 1022.42(a) (regulations requiring furnishers to "establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information" furnished to CRAs).

[3] Trans Union will cite to the exhibits filed in support of Plaintiff's Motion as "Pl. Ex. __." Trans Union will cite to the exhibits attached to the contemporaneously filed Declaration of Michael O'Neil (ECF 49) as "Ex. __."

[4] Plaintiff separately sued LCI for misattributing the bankruptcy filing to Plaintiff in its reporting to Bank of America, and sued Bank of America for closing his accounts and misreporting to Trans Union that Plaintiff's accounts were included in a bankruptcy. Both were filed as class actions, but Plaintiff settled his claim against Bank of America on an individual basis.

bankruptcy, Bank of America has extensive policies to evaluate and confirm such reports from LCI, which includes manual review of available bankruptcy documents and other information. (*Id*. at ¶¶ 6, 11-17.) Following the report from LCI, Bank of America closed Plaintiff's credit card account and home equity line of credit. (*Id*. at ¶¶ 18, 24.) In response to Plaintiff's dispute, Bank of America reactivated Plaintiff's credit card account and stopped reporting bankruptcy remarks to Trans Union in January 2020. (*Id*. at ¶ 25.) However, due to an employee's errors, Bank of America did not similarly correct the reporting of Plaintiff's home equity line of credit in bankruptcy to Trans Union until months later. (*Id*.)

On or about March 11, 2020, Trans Union prepared a credit report about Plaintiff in connection with his attempt to refinance his mortgage through a broker, Benchmark Funding. (Brooks Decl. at ¶ 12.) Plaintiff suggests that this report included bankruptcy remarks for more than one Bank of America account. (Mem. at 16.) However, the only reported bankruptcy remark was associated with his Bank of America line of credit. (Pl. Ex. 21 (Credco Instant Merge Credit Report) (ECF 43-23) at BROOKS0112; Pl. Ex. 22 (Benchmark FRR) (ECF 43-24) at BROOKS-TU00000471.) As noted above, that code was reported to Trans Union in error by Bank of America. (*See supra* at 3-4.)

Plaintiff claims that his refinance "application was denied." (Brooks Decl. at ¶ 12.) However, Plaintiff's Motion fails to acknowledge that, after that "denial," he was approved for the loan he sought days later. (Pl. 1st Supp. Resp. to Def.'s 1st Set of Interrogs. at 9 (attached as Ex. A).) Further, while Plaintiff claims the denial was the result of Trans Union's report, (*see* Brooks Decl. at ¶ 12), the notice of the denial specifically states that the reason for the denial was bankruptcy information reported by a different CRA, Equifax. (BROOKS0184-185 (copy attached as Ex. B).)

**B.     Plaintiff's Abandonment of Seven Class Claims and Revision of Definition of Class Whose Certification Plaintiff Seeks.**

Plaintiff's Amended Complaint identified eight (8) classes and subclasses that Plaintiff sought to certify and represent. (Am. Cmplt. at 8-9, ¶ 49.) However, Plaintiff now advises that, "[b]ased upon developments in discovery," Plaintiff is abandoning seven (7) class claims brought under the FCRA and California statutes. (Mem. at 10 n.3.) Plaintiff now purports to seek certification of "a refined version of the 'Tradeline-Only Bankruptcy Class.'" (*Id.*) In reality, the new class definition offered by Plaintiff's Motion represents not only a wholesale revision of that class definition, but an important concession that Plaintiff's long-held theory for proving the inaccuracy of the bankruptcy remark of absent class members has been completely disproven.

The core of Plaintiff's class claim for violation of Section 1681e(b) is that Trans Union's reporting of bankruptcy remarks for credit accounts where the credit report did not include a bankruptcy public record was inaccurate. (Am. Cmplt. at 4-5, ¶ 21 ("Thus, if there is no bankruptcy filing set forth in the Public Records section of a credit report, it is presumptive information that the consumer did not filed (sic) for bankruptcy.").) Plaintiff previously described the corresponding class as the "Tradeline-Only Bankruptcy Class." (*Id.* at 8, ¶ 49.) Notably, Plaintiff's sole opinion witness, a purported, "data scientist" charged with identifying members of that class, endeavored to only identify members of that now-abandoned class. (*See, e.g.*, Mem. at 18.)

However, Trans Union demonstrated that Plaintiff's theory of inaccuracy was fundamentally flawed, because the mere proof that a credit report did not contain a bankruptcy public record is not a reliable proof the consumer did not file for bankruptcy. (*See infra* at. 11-15.) Therefore, the efforts of Plaintiff's "data scientist," premised solely upon use of data

reported by Trans Union, did not identify credit reports which inaccurately reported the consumer had filed for bankruptcy.

C.  **Plaintiff's Various Evolving Theories of How to Identify a Class of Consumers Whom Trans Union Inaccurately Reported as Filing for Bankruptcy.**

Ultimately, given the failure to demonstrate how to prove the key element of the inaccuracy of each report of each putative class member, Plaintiff's Motion does not address it. Instead, Plaintiff contends that Trans Union agrees a relevant and applicable record should "go together."

1.  Plaintiff's failed efforts to devise a method for identifying possible class members.

Plaintiff offers the opinions of Jonathan Mr. Jaffe to supposedly show that the class is "currently and readily ascertainable." (Mem. at 23.) To be clear, Mr. Jaffe has not identified members of the modified class that Plaintiff seeks to certify. Instead, he has offered opinions that class members can be identified. However, a review of the uncontradicted record of the parties' cooperative efforts to identify class members demonstrates Mr. Jaffe's conclusory opinions are unsupported.

a.  The parties cooperative, albeit unsuccessful, efforts to identify class members.

Plaintiff began the process of trying to identify class members by serving Trans Union with an interrogatory asking Trans Union to identify the number of consumers in the original class definition, i.e., the subject of credit reports containing bankruptcy remarks but not public record bankruptcies. (Pl. Ex. 23 (Defendant Trans Union LLC's Fourth Supplemental Responses and Objections to Plaintiff's Interrogatory No. 7) (ECF 43-25) ("Pl. Ex. 23") at 1.) Trans Union had not previously attempted to perform the type of automated analysis of three (3) years' worth of raw credit-report data that would allow it to identify all such consumers. Accordingly, Trans

Union explained why it could not answer this interrogatory. (Pl. Ex. 23 at 2-3.) In response, as Plaintiff acknowledges (Mem. at 17-19), Plaintiff and Trans Union began a cooperative, iterative process to determine whether Trans Union could identify and extract to Plaintiff the data he believed could identify putative class members.

It should be noted that Plaintiff has never asked Trans Union to produce all credit reports furnished during the three-year class period, so that his data scientist could search for relevant data. Instead, Plaintiff has sought only raw data contained within three months of credit reports meeting only certain criteria, i.e., reports containing an account with a bankruptcy remark but not including a bankruptcy public record. Trans Union furnishes more than 80 million credit reports each month, or over 2.5 million reports each day. (BROOKS-TU00002586 (copy attached as Ex. C).) That represents approximately 960 million credit reports a year, or approximately 2.9 billion credit reports during the three-year class period. Further, the fraction of accounts with bankruptcy remarks is very small, i.e., less than 0.7% of the total number of accounts maintained by Trans Union. (*See infra* at 13.) Accordingly, identifying and extracting only the reports Plaintiff seeks would require scanning raw data reflecting almost three (3) billion credit reports (which are stored as raw data). Trans Union has demonstrated it has never undertaken such efforts and that its attempts to do so here on only a few months of data have proven unfeasible.

The first agreed-upon step in the parties' process was, as Plaintiff requested, for Trans Union to identify files of consumers that, in June 2022, satisfied certain criteria that Plaintiff believed fit the profile of possible class members. (Pl. Ex. 23 at 3-4.) Next, at Plaintiff's request, Trans Union determined which of those files were the subject of a Trans Union credit report in June 2022, i.e., the month when the file met Plaintiff's criteria for possible class membership. (Pl. Ex. 23 at 4.)

As they engaged in this lengthy (and, ultimately, unsuccessful) effort to devise a multi-step process to identify possible class members, the parties jointly requested that this Court extend the time for the parties to complete such discovery and for Plaintiff to move to certify a class. As part of these joint requests, the parties explained that "as the Parties have discussed and advised the Court, Defendant has never undertaken the multi-step, automated process under discussion by the Parties, and therefore the Parties are discussing and investigating how to identify class members." (ECF 34 at 1; *see also* ECF 38 at 1 (same); Aug. 22, 2022, Stip. ("Trans Union has never undertaken the multi-step, automated process under discussion by the parties, and therefore the parties are discussing that design and testing of custom queries and other searches").) This ongoing process involved depositions of multiple Trans Union witnesses, and Plaintiff retaining Mr. Jaffe to devise a method for identifying class members. (*See* ECF 39 at 1-2 (discussing steps undertaken by parties to attempt to identify class members).) Again, at every step, Trans Union agreed to attempt to provide Plaintiff with the data he had requested, and also agreed to extend the litigation schedule to allow time for Mr. Jaffe to determine a method for ascertaining class members.

Ultimately, Trans Union was able to create, test, and implement a custom process to identify and extract data from credit reports delivered in June 2022 that satisfied Plaintiff's criteria. (Pl. Ex. 23 at 3-8.) Trans Union was not able to use Mr. Jaffe's proposed process. Instead, for the month of data it produced, Trans Union used a custom process to query one of the three (3) datasets containing such data. (Pl. Ex. 23 at 7.)

Plaintiff later requested similar data from two other months. However, the data for the other two months was stored on different systems than the June 2022 data Trans Union was able to extract using its custom process. Trans Union attempted to query the raw data in these other

systems using the same process it used to extract the June 2022 data, but was unable to do so. (Pl. Ex. 23 at 7-9.) Moreover, Trans Union's attempts to modify the process were complex and required more than one day to identify, process, and extract a single day of credit-report logs (Pl. Ex. 23 at 8-9), i.e., much longer than Plaintiff now suggests (*see infra* at 9-11).

> b. Plaintiff's claim that Trans Union can use the "existing functionality" of its systems to identify credit reports of possible class members.

Turning to Plaintiff's use of Mr. Jaffe's opinions, Plaintiff first claims that, according to Mr. Jaffe, "the existing functionality of computer [sic.] Trans Union's systems can be used to isolate and extract" credit-report data satisfying the proposed class definition. (Mem. at 18 (citing Pl. Ex. 25 (March 24, 2023 Declaration of Jonathan Jaffe) (ECF 43-27) ("Jaffe March 2023 Report") at ¶¶ 13-60).) This opinion glosses over the key fact that—as Mr. Jaffe acknowledges—Trans Union stores the relevant raw credit-report data, i.e., FFR data, in three separate systems: (1) a system called Splunk; (2) tape archives from the Splunk system; and (3) a separate long term file storage ("LTFS") system. (Jaffe March 2023 Report at ¶¶ 25, 37.) Nor does Plaintiff acknowledge the different functionality of these systems.

Mr. Jaffe proposed specific queries for the data contained in Splunk. (Jaffe March 2023 Report at ¶¶ 36-52.) However, as noted above, Trans Union was unable to use this proposed query and on its own devised a method to identify and extract historic, raw credit-report data from the Splunk system on an automated basis. (*See supra* at 8-9.) This is not surprising, as Mr. Jaffe has never used Splunk. (Pl. Ex. 26 (Transcript of Jonathan Jaffe's January 23, 2024 Deposition) (ECF 43-28) ("Jaffe Dep.") at 18:19-19:6.) Neither Plaintiff nor Mr. Jaffe address these facts, or Trans Union's inability to use Mr. Jaffe's proposed method to query Splunk data.

Mr. Jaffe's report cited by Plaintiff is limited to the non-archived Splunk data and does not discuss how Trans Union could query the second set of data, i.e., the Splunk data on tape

archives. (Jaffe March 2023 Report at ¶¶ 36-52.) Thus, Plaintiff and Mr. Jaffe ignore the "functionality" of the second system where Trans Union stores the data at issue.

Mr. Jaffe's report discusses the data in the third system, i.e., LTFS, as well as his understanding of the general search capabilities of that system. (Jaffe March 2023 Report at ¶¶ 27-35.) However, Mr. Jaffe proposed no queries to extract data from that system. (Jaffe March 2023 Report at ¶¶ 27-35.) Nor did Mr. Jaffe attempt to perform such queries on the LTFS data. Nor does Plaintiff acknowledge Trans Union's explanation that the process it used for data on a different system would not work for the LTFS data, i.e., the system functionality is different. (*See supra* at 8-9.) Mr. Jaffe, in essence, is merely opining on the theoretical possibilities of querying the data held in LTFS or the tape archives, and offers no support for the suggestion that unidentified queries could actually identify class members.

Thus, by his Rule 23 Motion, Plaintiff offers no factual support for his supposition that Trans Union can easily use the "existing functionality" of its multiple systems to query its data to locate raw credit-report data about possible class members.

c.      Plaintiff's estimates of how long it would take to identify class members.

Second, because Mr. Jaffe has never attempted to ascertain membership in the three-year class, Plaintiff's Motion offers an estimate for the time it would take to do so. Plaintiff summarily contends that, according to Mr. Jaffe, "a review of FFR records extracted this way could be conducted in a matter of days or weeks." (Mem. at 18 (citing Pl. Ex. 26 (Jaffe Dep.) at 87:12-88:24, 97:5-16) (emphasis added).) Consistent with the glaring omission in Mr. Jaffe's reports and testimony discussed above, Plaintiff does not identify the "'this-way' method" that would be employed to extract the data. In any event, Plaintiff fundamentally misconstrues the relevance of the time estimate offered by Mr. Jaffe. It was an estimate only of the time it took

him to examine the raw data relating to the 1,500 credit reports from June 2022 that Trans Union had already extracted. (Jaffe Dep. at 99:23-100:9.) Therefore, this statement is irrelevant to whether, and how long it would take for, Trans Union to devise, test, and implement some unknown method for "extracting" the data from separate systems before it can be reviewed. Further, because he never proposed such a method, or tested the hypothetical method, Mr. Jaffe does not know how long it would take to extract such data so that he could query it. (*See, e.g.,* Jaffe Dep. at 78:2-16, 96:2-16.) Accordingly, Mr. Jaffe has not offered an opinion on the time it would take to extract and review data to identify the proposed class.

        2.     Trans Union's uncontradicted opinions regarding unreliability of the lack of public record in credit report to prove inaccurate bankruptcy remark.

As explained below (*see infra* at 21-22), Plaintiff's claim is that Trans Union should not have included the bankruptcy remarks Bank of America furnished to Trans Union because his credit file at the time included no corresponding bankruptcy public record. Therefore, according to Plaintiff, Trans Union should have known the remark was inaccurate. Based on that unsupported belief,[5] Plaintiff has contended the absence of a public record on the credit report containing the bankruptcy remark can prove the inaccuracy of all absent class members. (*See, e.g.,* Am. Cmplt. at ¶ 21.)

In response, Trans Union offered the expert opinions of its longtime employee Corinne Wodzinski, who had responsibility for more than twenty years for developing, analyzing, and updating the algorithms it uses to match credit account information received from creditors and public records (e.g., bankruptcy filings) to credit files maintained by Trans Union. (Rule 26(a)(2)(B) Report of Corinne Wodzinski ("CW Rep.") at ¶¶ 1, 7-9 (copy attached as Ex. D).)[6]

---

[5] This core contention of Plaintiff's § 1681e(b) class claim is unsupported by opinion (or fact) testimony.
[6] Although Plaintiff acknowledges Ms. Wodzinski's opinions (Mem. at 11 n.5), he fails to address them.

Ms. Wodzinski identified in her expert disclosure report a number of reasons why a public record may not be added to the correct file and that the absence of a public record was not a reliable indicator the consumer did not file for bankruptcy.

As Ms. Wodzinski explained, Trans Union's internal procedural goal is to maintain a single file for each unique consumer. (CW Rep. at ¶¶ 11-14, 28.) When Trans Union receives information about a new credit account or bankruptcy filing, it examines the identifying information associated with that account or filing, i.e., name, address, date of birth, and Social Security Number ("SSN"), to determine whether that information matches the corresponding information on an existing credit file. (CW Rep. at ¶¶ 15-17; *see also, e.g.,* Pl. Ex. 4 (Transcript of Corinne Wodzinski's January 19, 2024 and January 22, 2024 Depositions) ("CW Dep.") at 59:2-15, 61:7-24.) If Trans Union's algorithms do not detect a sufficient match of the incoming identifying information to that of an existing file, Trans Union will create a new file containing the new information. (CW Rep. at ¶¶ 23-26; *see also, e.g.,* CW Dep. at 94:3-97:5, 121:3-122:16.) Because Trans Union will only include the contents of one file in a credit report, in some instances certain information relating to a consumer (e.g., a bankruptcy public record) may not be included in a report about that consumer. (CW Rep. at ¶ 25; *see also, e.g.,* CW Dep. at 124:15-21, 128:3-12.)

Trans Union's file-matching algorithms account for typographical errors, e.g., transposing digits in SSNs, as well as changes to information over time, e.g., a consumer changing their last name or moving to a new address. (CW Rep. at ¶¶ 18-22; CW Dep. at 110:11-113:24.) Such data entry errors or changing data can result in an account or public record not being assigned to an existing Trans Union file. (CW Rep. at ¶¶ 23-28; *see also, e.g.,* CW Dep. at 98:4-99:11.) Additionally, it can be challenging for Trans Union to confidently match

bankruptcy filings to existing credit files. In addition to data entry errors, public records of bankruptcy filings do not contain dates of birth and only the last four digits of the debtor's Social Security Number. (CW Rep. at ¶ 21.) Accordingly, based on her decades of experience with Trans Union's file-matching algorithms and the underlying data, Ms. Wodzinski opined that: (1) there are multiple reasons why a credit file may contain accounts with bankruptcy remarks but no corresponding public record; and (2) the absence of a bankruptcy public record from a Trans Union file does not definitively establish that the consumer did not file for bankruptcy. (CW Rep. at ¶¶ 3(a)-(b), III, IV, 11-32.)

Ms. Wodzinski explained that the circumstance of a consumer file with a bankruptcy remark but no public record was relatively rare. Trans Union's database contains more than 242 million files, with more than 3.3 billion total accounts in those files. (CW Rep. at ¶ 30(a); CW Dep. at 34:6-9.) During the putative class period, the number of accounts with bankruptcy remarks was less than 0.7% of the total number of accounts maintained by Trans Union. (CW Rep. at ¶ 30(b)(i).)

Ms. Wodzinski also examined Trans Union credit data in the files of possible class members whose Trans Union files, as of June 2022, contained one account with a bankruptcy remark but with no bankruptcy public record currently on the file. (CW Rep. at ¶¶ 33-37; CW Dep. at 146:20-149:17.) Ms. Wodzinski called the file meeting those criteria "File A." (*See, e.g.,* CW Dep. at 157:3-13, 159:9-160:14, 234:5-236:23; Ex. A to CW Report, *passim*.) Ms. Wodzinski also examined additional files in Trans Union's database that may relate to the individual who was the subject of each File A. She called those additional files "File B" and, where present, "File C."[7] (CW Dep. at 157:3-13, 159:9-160:14, 234:5-236:23; Ex. A to CW

---

[7] For convenience, and unless discussing both a File B and a File C, Trans Union will generally refer to one or more such additional files as "File B."

Report, *passim*.) That review indicated a significant percentage of those consumers, in fact, had potentially filed for bankruptcy. Ms. Wodzinski examined 50 of the File As of putative class members and concluded that, for 26 of the 50 consumers (or 52% of the sample), Trans Union had a File B in its database containing a bankruptcy public record which potentially corresponded to the consumer whose data was contained in File A. (CW Rep. at ¶¶ 33-49; CW Dep. at 42:16-17, 174:2-178:2, 218:22-221:11.)

Ms. Wodzinski also identified the likely reasons the public record was not on the File A of the putative class member. Some of these instances involved a name spelled differently on the File A Ms. Wodzinski examined and the File B with the bankruptcy public record. (*See, e.g.*, Ex. A to CW. Rep. at 1, line 100.) Other instances involved varying, non-matching SSNs on the File A she examined and the File B with the bankruptcy record. (*See, e.g.*, Ex. A to CW. Rep. at 6, line 1200 (File A had SSN of 464<u>2</u> and File B had SSN of 464<u>3</u>); *id*. at 6, line 1300 (File A and File B had same name and full address, but File B with public record had different SSN than SSN on File A); *id*. at 16, line 4100 (same, but only first five digits of SSN were different; both File A and File B had same last four digits of SSN).) Yet other instances involved a bankruptcy remark attached to an account on File A reported with indicative information relating to apparent spouses with separate Files B and C, e.g., combining one spouse's SSN and the other's DOB. (*See, e.g.*, Ex. A to CW. Rep. at 2, line 300 (bankruptcy public record on both Files B and C, but File A contained Dob and SSN of File B spouse but name of File C spouse).) In such instances, as Ms. Wodzinski explained, it is difficult for Trans Union's file-matching algorithms to determine on which file to place the account. (CW Dep. at 135:18-137:7.)

Notably, Ms. Wodzinski opined that if other data beyond that in the Trans Union credit database was examined, she expected that an even higher percentage of putative class members

who had filed for bankruptcy would be found. (CW Rep. at ¶¶ 53-54; CW Dep. at 39:6-40:4, 46:6-7, 304:31-307:16.) Ms. Wodzinski explained that her analysis relied only on exactly matching data on each File A (e.g., SSNs) with the corresponding data on other Trans Union files, but that further investigation—including reviewing bankruptcy filings—may reveal additional bankruptcy filings associated with the File As she examined. (CW Rep. at ¶¶ 50-54; CW Dep. at 39:6-40:4, 46:6-7, 304:31-307:16.) To further support that opinion, counsel for Trans Union requested a search of public bankruptcy records by a paralegal. (*See* Declaration of Albert Hartmann ("Hartmann Decl.) at ¶¶ 3-7 (copy attached as Ex. E).) That search identified an additional 19 possible bankruptcy filings for the 26 potential class members for whom the Trans Union File A examined by Ms. Wodzinski did not contain such a record. (Supp. Ex. to CW Rep. (copy attached as Ex. F).) As Ms. Wodzinski testified, this was the result she expected. (CW Dep. at 38:12-40:4, 304:21-307:16.)

> 3. Plaintiff's new proposal to search PACER records for public records, and Trans Union's testing of it.

Plaintiff originally defined the class including proof of inaccuracy based on the absence of a bankruptcy public record in a credit report including an account with a bankruptcy remark. (Am. Cmplt. at ¶ 49(a).) However, by his Rule 23 Motion—filed after Ms. Wodzinski's report and deposition—Plaintiff modified that class definition to include the additional requirement that "there is no government-held public record of a bankruptcy filings within ten (10) years prior to the date of the report." (Mem. at 10.) According to Plaintiff, "[t]he presence or absence of a publicly available bankruptcy record with the same nine-digit social security number ('SSN') as the individual who was the subject of the credit report can be easily and objectively determined through a simple automated search of bankruptcy records on PACER." (Mem. at 19.)

Plaintiff proposes to establish this new class-definition element by using PACER to search for filings, matching only on the consumer's SSN contained within the Trans Union file that did not include the public record. (Mem. at 19; Pl. Ex. 29 (Brennan Decl.) at ¶ 8.)[8] The only work product provided as part of this effort were lists of consumers with "TRUE" or "FALSE" notations indicating what the paralegals found. (*See* Brennan Decl. at Exs. B, C.) Plaintiff did not provide the corresponding bankruptcy dockets or the identifying information relating to the debtor.

Ms. Wodzinski identified the transposition of SSNs, names and other differing indicative information that caused Trans Union's algorithms to not include the public record in the consumer's File A, and why comparing multiple data is necessary to properly attribute bankruptcies to consumers. However, Plaintiff's paralegals did not consider such transpositions or differing indicative data when conducting their searches. Instead, based on the description of the searches conducted by paralegals at Ms. Brennan's direction, the paralegals only searched for matches on the full nine digits of the SSN contained in the records produced by Trans Union. (Brennan Decl. at ¶¶ 8-9.)

After learning of the previously-nondisclosed methodology, Trans Union sought to test the reliability of using only the same SSN that failed to associate the public record in Trans Union's database, to prove a consumer never filed for bankruptcy. Trans Union's counsel instructed a paralegal to search PACER records for the first 50 entries on Plaintiff's list of putative class members for whom Plaintiff's paralegals did not find a public record, i.e., Exhibit B to Ms. Brenna's declaration. (Ex B to Pl. Ex. 13.) Unlike Plaintiff's paralegals, defense

---

[8] Plaintiff also cites to Mr. Jaffe's deposition to support the validity of their proposed PACER searches using only SSNs. (Mem. at 19.) However, Mr. Jaffe simply testified that PACER allowed searching by full SSNs, even if all digits were not displayed. (Mr. Jaffe Dep. at 126:10-127:6, 148:2-149:7.) This does nothing to support the reliability of Plaintiff's proposed search for public records.

counsel's paralegal searched PACER for bankruptcy filings using the name on Plaintiff's list, as well as any other names included on the underlying Trans Union credit report. (Hartmann Decl. at ¶¶ 8-15.) Additionally, to locate bankruptcy filings, Trans Union compared the consumer's address(es) on the credit report with the address of the debtor on the bankruptcy filing. (Hartmann Decl. at ¶¶ 16-17.)

Based on these searches using names and addresses on the credit file, first, Trans Union located potential bankruptcy filings for 17 (or 34 % of the 50 examined entries) where the names, street addresses, cities, states, and zip codes on the credit report exactly matched those of individuals who filed for bankruptcy for whom Plaintiff's search found no record. (Hartmann Decl. at ¶¶ 18, 20-21; *see also* Ex. 1 to Hartmann Decl. (chart with results, relevant screen prints from PACER and credit reports showing matching data).) Trans Union, second, located an additional 13 (26% of the 50 examined entries) bankruptcy filings where the name on the credit report matched a name on the filing, and the filing was in a state on that same credit report. (Hartman Decl. ¶¶ 19-21; *see also* Ex. 1 to Hartmann Decl.) (Unlike Plaintiff, Trans Union is also presenting this Court with the underlying bankruptcy filings and credit-report data confirming its analysis. (Ex. 2 to Hartmann Decl.)) Thus, for 60% of the 50 examined entries, Trans Union was able to locate a possible bankruptcy filing by an individual Plaintiff claims never filed for bankruptcy.

## III.    ARGUMENT

### A.    Governing Rule 23 Standards and Burdens of Proof.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 309 n.6 (3d Cir. 2008) (hereinafter "*Hydrogen Peroxide*") (citation omitted).  To obtain certification of the class, Plaintiff must prove the four requirements of Rule 23(a): numerosity,

commonality, typicality, and adequacy. *Gonzalez v. Owens Corning*, 885 F.3d 186, 192 (3d Cir. 2018) (citation omitted). Plaintiff also must prove the predominance requirement of Rule 23(b)(3), because he seeks to recover damages on behalf of the putative class. *Dean v. CVS Pharm., Inc.,* No. CV 14-2136, 2018 U.S. Dist LEXIS 138633, at *1 (E.D. Pa. Aug. 16, 2018) (citing *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 183 (3d Cir. 2001)). Plaintiff continues to bear the burden of proving each of these requirements by a preponderance of the evidence. *Harnish v. Widener Univ. Sch. of Law*, 833 F. 3d 298, 304 (3d Cir. 2016); *see also In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020) (hereinafter "*Lamictal*") (same).[9] "If a district court harbors uncertainty about whether the Plaintiff has satisfied the requirements of Rule 23, class certification should be denied." *In re Niaspan Antitrust Litig.*, 67 F. 4th 118, 130 (3rd. Cir. 2023) (hereinafter "*Niaspan*").

A district court abuses its discretion if its decision granting or denying class certification "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Hydrogen Peroxide,* 552 F.3d at 312 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*, 259 F.3d 154, 165 (3d Cir 2001)).

"Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." *Hydrogen Peroxide*, 552 F.3d at 309 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982)). A trial court must conduct this rigorous analysis "even if it involves judging credibility, weighing evidence, or deciding issues that overlap with the merits of a plaintiff's claims." *Harnish*, 833 F.3d at 304 (citing *Hydrogen Peroxide*, 552 F.3d at 316-25).

---

[9] Plaintiff's contention that he need only make "a preliminary legal showing" of the Rule 23 requirement and then the burden of proof shifts to Trans Union, supported not by caselaw but only by reference to a 24-years old treatise (Mem. at 21) is simply wrong.

Furthermore, as the Third Circuit has instructed:

[B]ecause the decision whether to certify a class requires a thorough examination of the factual and legal allegations, the court's rigorous analysis may include a preliminary inquiry into the merits and the court may consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.

*Hydrogen Peroxide*, 552 F.3d at 317 (citations omitted).  *See also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (noting that "Frequently" the district court's "'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.").

### B.     Plaintiff's Cursory Commonality Argument Fails.

To satisfy the commonality requirement of Rule 23(a)(2), this Court must find there are "questions of law or fact common to the class." As Plaintiff concedes (Mem. at 24), the Supreme Court in *Wal-Mart*, held that it is not common questions but common answers to those questions that establish commonality. 564 U.S. at 374-75 (reversing Rule 23(b)(3) class certification due to lack of Rule 23(a)(2) commonality). Here, Plaintiff only identifies two "common questions," i.e., the reasonableness of Trans Union's procedures and the related question of whether those procedures are so unreasonable to be willful (Mem. at 24). However, Plaintiff does not offer answers to those general questions, nor does Plaintiff identify any common evidence he might rely on to prove these arguments. "Posing a hypothetical common question is not enough to satisfy Plaintiff's burden of proof. There must be evidence the class proceeding will likely 'produce a common answer.'" *Allen v. Ollie's Bargain Outlet, Inc.,* 37 F.4th 890, 901 (3rd Cir. 2022) (reversing class certification, finding that district court abused its discretion in finding Rule 23(a)(2) commonality). Therefore, Plaintiff has failed to establish the requisite commonality.

## C.    Individualized Issues Predominate Over Common Questions.

Class certification is not appropriate here unless this Court determines that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.Pro. 23(b)(3). The essential requirement of Rule 23(b)(3) predominance is "more rigorous" than the commonality requirement of Rule 23(a)(2); *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir. 2013) (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011). "Predominance measures whether the class is sufficiently cohesive to warrant certification." *Newton*, 259 F.3d at 187. "Issues common to the class must predominate over individual issues…" *Hydrogen Peroxide,* 552 F.3d at 311 (quoting *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 313-14 (3d Cir. 1998)).

1.    The predominance inquiry must start with the elements of the claim.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The Third Circuit has reaffirmed this fundamental principle of Rule 23 and has held that predominance "focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." *Hayes*, 725 F.3d at 359. In assessing predominance, "a court at the certification stage must examine each element of a legal claim through the prism of Rule 23(b)(3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 600 (3d Cir. 2012). If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Lamictal*, 957 F.3d at 190 (quoting *Hydrogen Peroxide*, 552 F.3d at 311). The predominance requirement therefore demands that the essential elements of the class claims be "capable of proof at trial through evidence that [is] common to the class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013) (citation omitted). In meeting the predominance requirement, Plaintiff "must demonstrate that

the element of the legal claim is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Lamictal*, 957 F.3d at 190 (citations omitted). Plaintiff acknowledges this rule of law (Mem. at 28), but then ignores it.

Plaintiff, neither as part of his cursory predominance analysis (Mem. at 28-30), nor elsewhere in his Motion, identifies for this Court the elements of his Section 1681e(b) claim. Most notably, Plaintiff does not acknowledge that proof of the inaccuracy of the information reported by Trans Union is a core element of that claim. In order to prevail on a Section 1681e(b) claim, a Plaintiff must prove: "(1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate entry." *Cortez*, 617 F.3d at 708 (quoting *Philbin,* 101 F.3d at 963); *see also Crane v. Trans Union, LLC*, 282 F. Supp. 311, 319 (3d Cir. 2003) (In order to recover under a Section 1681e(b) claim, the plaintiff must establish both "that the CRA included inaccurate information in his credit report, but also that (1) the inaccuracy was due to the CRA's failure to follow reasonable procedures to assure maximum possible accuracy; (2) the consumer suffered injury; and (3) the consumer's injury was caused by the inclusion of the inaccurate entry.") and *Berkery v. Equifax Info. Servs.*, 429 F. Supp. 3d 24, 31-32 (E.D. Pa. 2019) (Pratter, J.) (listing same elements). That a consumer's credit report contains inaccurate information is the keystone of a Section 1681e(b) claim. *See Bibbs v. Trans Union LLC*, 43 F.4th 331, 342 (3d Cir. 2022) ("An inaccuracy is the threshold requirement for a § 1681e(b) claim."); *Krajewski v. Am. Honda Fin. Corp.*, 557 F. Supp. 2d 596, 614 (E.D. Pa. 2008) ("A plaintiff cannot sustain a claim to enforce § 1681e(b) without showing an inaccuracy in her credit report."); and *Davis v. Screening*, No. 22-2468, 2024 U.S. Dist. LEXIS 15735, at

*11-12 (E.D. Pa. Jan. 30, 2024) (granting summary judgment on Section 1681e(b) claim because plaintiff could not establish that the consumer report was inaccurate or misleading).

Plaintiff acknowledges that it must employ individualized, manual searches of public bankruptcy records to remove from the putative class those consumers who did file for bankruptcy, but does not address how these necessary mini-trials defeat proof of predominance.

> 2.    Plaintiff's predominance argument fails

"'Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" *Lamictal*, 957 F.3d at 190 (citations omitted). Predominance also "necessarily entails some analysis of whether the proposed class-wide evidence"—if there is any—"will actually be sufficient for the class to prevail on the predominant issues in the case." *Harnish*, 833 F.3d at 304-305. "If class-wide evidence is lacking, the court cannot be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication." *Id.* And if "proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.'" *Lamictal*, 957 F.3d at 190 (citation omitted).

Rather than addressing the elements of the claim here and arguing why common questions predominate over individualized issues, Plaintiff's cursory predominance argument is that "courts have regularly found that common issues are more likely to predominate in an FCRA class action seeking only statutory damages." (Mem. at 29.) Here, however, unlike in those decisions, Trans Union does not contend that the damages awardable to class members is an individualized issue that that defeats predominance. Instead, although not addressed by Plaintiff, Trans Union points to the proverbial "elephant in the room," i.e., the need to

individually review the three years' of credit-report data, and then use that data to individually and manually, search through, identify, and extract public bankruptcy records to prove the inaccuracy of each report. Such necessary individualized "mini-trials" were necessary in the decisions cited by Plaintiff.

Plaintiff purports to identify trial issues which can be proven by common issues (Mem. at 29-30), but does not engage in the necessary weighing of individual and common issues that is necessary under Rule 23(b)(3). Plaintiff suggests that alleged common evidence supporting a classwide request for statutory damages suffices to establish that common issues predominate over individualized issues. (Mem. at 29.) However, aside from not addressing the individualized issue of inaccuracy, this approach is inconsistent with the more nuanced analysis of the predominance requirements. The Third Circuit has made clear that the "predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues.'" *See Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 156 (3d Cir. 2023) (quoting *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019)).

       3.      The need for individualized proof that each class member's inaccurate credit report was inaccurate defeats a finding of predominance.

The whole purpose behind a class action is to allow for a classwide resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. To this end, the Rule 23(b)(3) predominance analysis requires courts to "'give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a

common question is one where the same evidence will suffice for each member[.]'" *Ferreras*, 946 F.3d at 185 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

Plaintiff does not and cannot point to any common evidence that would prove inaccuracy for each of the absent class members, as required to show that inaccuracy is a common—as opposed to individualized—issue in this case. *See Tyson Foods,* 577 U.S at 453 (explaining that a question is individualized if the plaintiffs "will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof") (citation omitted).

Indeed, the individualized inquiries ordinarily necessitated to resolve the inaccuracy element of claims brought under Section 1681e(b), or under Section 1681i, are why courts routinely reject, on predominance grounds, certification of class actions asserting FCRA claims that require proof of inaccuracy. *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc v. USIS Com. Servs., Inc.*, 537 F.3d 1184, 1194 (10th Cir. 2008) (affirming denial of class certification where determining the accuracy of class members' employment history records presented a predominating individualized inquiry); *Klotz v. Trans Union, LLC,* 246 F.R.D. 208, 216 (E.D. Pa. 2007) (denying class certification because individualized issues, including threshold issue of "whether the disputed information was inaccurate," would predominate); *Harper v. Trans Union, LLC*, No. 04-3510, 2006 U.S. Dist. LEXIS 91813, at *7, *23-26 (E.D. Pa. Dec. 20, 2006) (rejecting certification and finding that accuracy, among other issues, was individualized and defeated class certification where the credit reports of putative class members purportedly "incorrectly noted that" they "had filed for bankruptcy protection"); *Wilson v. First Advantage Background Servs. Corp.*, No. 21-cv-06071-SRB, 2023 U.S. Dist. LEXIS 157930 at *8-9 (W.D.

Mo. July 28, 2023) (denying class certification of § 1681e(b) claim for lack of predominance

due, in part, to need to prove each class member's report was inaccurate); *Jones v. RealPage,*

*Inc.*, Civ. No. 19-2087, 2020 U.S. Dist. LEXIS 251189, at *19-23 (N.D. Tex. Jan. 27, 2020)

(holding "that individualized issues will predominate with respect to determining whether each

putative class member's consumer report was inaccurate" where there were "likely members of

the class whose reports are indeed accurate" and would need to be identified); *Henderson v.*

*Corelogic Nat'l Background Data, LLC*, No. 12-0097, 2016 U.S. Dist. LEXIS 119442, at *38

(E.D. Va. Sept. 2, 2016) (finding that the individual issue of completeness under 15 U.S.C. §

1681k predominated where plaintiffs challenged reporting of criminal background data, which

would require an individualized review of each record to determine whether and how it was

incomplete).[10]

        4.    Plaintiff does not intend to introduce trial evidence of class-member
            inaccuracy.

     Plaintiff not only fails to explain how he will prove the inaccuracy of class members'

credit reports, he also makes clear he will not offer such proof. After realizing, in light of Ms.

Wodzinski's uncontradicted opinions and supporting analysis, that credit reports with bankruptcy

remarks but no corresponding public record will not prove inaccuracy, Plaintiff pivoted at the

11th hour to a new theory and method of proving that essential element of the claim. Plaintiff

now proposes he will rely on the unexplained efforts of paralegals to review court records for

---

[10] *See also Garcia v. Equifax Info. Servs., LLC*, No. 2:17-cv-03123-JAD-VCF, 2020 U.S. Dist. LEXIS 252995, at
*17-18 (D. Nev. March 23, 2020) (striking class allegations where there were individual questions on inaccuracy
and plaintiff failed to show that two common questions were more "numerous or important than "questions about
inaccuracy"); *Gomez v. Kroll Factual Data, Inc.*, No. 13-cv-0445-WJM-KMT, 2014 U.S. Dist. LEXIS 51303, at *9
(D. Colo. Apr. 14, 2014) (denying class certification in § 1681e(b) case where issue whether each class member's
"credit report was inaccurate" would require individualized treatment); *Farmer v. Phillips Agency, Inc.*, 285 F.R.D.
688, 703 (N.D. Ga. 2012) (despite presence of some common issues, denying certification in § 1681k
"completeness" case where "the court will need to conduct individual inquiries for each consumer with respect to"
whether information in their reports was accurate and complete).

==bankruptcy filings by putative class members, in a reverse subtraction method of identifying== ==class members who do **not** belong in the class. (*See* Mem. at 19; Pl. Ex. 29 (Brennan Decl.) at ¶== ==9.)== However, that work will not be presented at trial to the jury (*see* Mem. at 30-31 (Plaintiff's trial plan)), but instead will be decided by these paralegals, presumably in preparing a class list for notice purposes.

More broadly, Plaintiff does not contemplate any trial of, or jury decision on, any claims related to the class, as his trial plan contemplates only a trial of Plaintiff's individual claims. (*Id.*) This approach to the class trial is inconsistent with the clean mandate of the Third Circuit, which has instructed district courts to include in certification orders a clear and complete statement of "the claims, issue or defenses [will] be treated on a class basis," *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 188 (3rd Cir. 2006). In order to enable such a finding by the trial court, the Third Circuit instructed a plaintiff seeking class certification "to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible to class-wide proof." *Id.* at 186. (quoting Fed.R.Civ.P. 23(c)(1)(A) advisory committee note). Plaintiff has offered a trial plan, however, it does not contemplate <u>any</u> proof of any aspect of the class claims (Mem. at 26-27). Instead, Plaintiff contemplates he "will present his individual case" and "[i]f the jury finds for Plaintiff, the Court can render a judgment <u>for the class</u> based on the jury's findings." (*Id.* (emphasis added.))

Simply put, there is no class-wide evidence that can resolve the requisite inaccuracy element "in one stroke" for all class members, which is what settled precedent demands. *Wal-Mart*, 564 U.S. at 350 ("[A] common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

**D.    Lack of Common Evidence of Inaccuracy Precludes the Necessary Determination of Superiority.**

Rule 23 also requires this Court to determine that "a class action is superior to other methods" for adjudicating the class members' claims. Fed. R. Civ. Pro. 23(b)(3). Because the jury would need to make individual determinations whether each class member's bankruptcy remark was inaccurate, the need to prove such inaccuracy also precludes any finding that class adjudication would be superior to individual lawsuits. "Superiority mandates that the district court determine that the class action is the best method of fairly and efficiently resolving the controversy." *Johnston,*265 F.3d at 185 (citation omitted). The "polestar of Rule 23(b)(3)" is whether and "how a trial of this controversy, if tried as a class action, could be efficiently and fairly managed." *In re LifeUSA Holding*, 242 F.3d 136, 148 (3d Cir. 2001). Courts should therefore "address 'the difficulties likely to be encountered in the management of a class action.'" *Johnston*, 265 F.3d at 194 (citation omitted).

Applying these standards, a class action is unmanageable, and thus not superior, where a "multitude of individualized issues presented in plaintiffs' claims would entail complicated mini-litigations within the class itself." *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 149 (3d Cir. 2008); *see also Johnston*, 265 F.3d at 194 (finding class action not superior where a trial "would involve essentially countless mini-trials" to evaluate proof of liability "and the applicability of any defenses[,]" that "would present severe manageability problems for the court"); *Newton*, 259 F.3d at 192 (similar); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1278 (11th Cir. 2009) (superiority not met where, given the "central individualized issues[,] … any trial of this case would require the presentation of a substantial amount of evidence specific to each of an unknown number of class members").

The manageability of a proposed class is determined by the manageability of Plaintiff's proposed trial plan. *See Blain v. SmithKline Beechem Corp.*, 240 F.R.D. 179, 192 (E.D. Pa. 2007). However, consistent with the failure of Plaintiff's Motion to address the individualized determination of the inaccuracy of each class members' report, his trial plan contemplates only trying Plaintiff's individual claims with no mention of how to try the class claims. (Mem. at 32-33.) This approach violates the Third Circuit's admonition that Rule 23 movants, and courts certifying classes, must identify "the issues likely to be presented at trial and tests whether they are susceptible to class-wide proof." *Sullivan*, 687 F.3d at 315 (citing Rule 23(c)(1)(A) advisory committee notes).

Just as Plaintiff's proposed trial plan omits any reference to proof of the class claims, his Motion ignores the manageability issues arising from such necessary proof, including most notably proof that each class member's credit reports were inaccurate. Instead, Plaintiff's summarily states: "This class action would be easily manageable." (Mem. at 31.) In fact, in a case also brought by Plaintiff's counsel against Trans Union, which similarly claimed Trans Union inaccurately reported that class members had filed for bankruptcy, the Eastern District of Pennsylvania held that "the individualized proofs required to establish liability under §1681e(b)," including proof of inaccuracy, created manageability issues that precluded a finding that a class action was superior to individual lawsuits. *Harper*, 2008 U.S. Dist. LEXIS 91813 at 27.

### E.    Ascertaining Class Membership is Not Administratively Feasible.

1.    The Third Circuit's 'heightened ascertainability" test.

The Third Circuit has made clear that certification under Rule 23(b)(3) requires that "class [members] . . . be 'currently and readily ascertainable based on objective criteria.'" *Niaspan*, 67 F.4th at 129 (quoting *Hargrove v. Sleepy's LL*, 974 F.3d 467, 477 (3d Cir. 2020).)

The method for ascertaining class membership must also be "reliable" and "economical." *Id*. at 130, 132. The ascertainability requirement has been described "as 'an essential prerequisite' to class certification. *See Hayes*, 725 F.3d at 354, *accord Niaspan*, 67 F.4th at 132 ("Ascertainability is a Key Requirement for Class Actions").

To satisfy that heightened ascertainability requirement,[11] "[p]laintiffs must show that '(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Niaspan* at 130. (citation omitted). Finally,

> [A] plaintiff must propose a classification method with evidentiary support to meet the ascertainability requirement, and "trial courts `must engage in a rigorous analysis and find each of Rule 23[]'s requirements met by a preponderance of the evidence before granting certification. They must do so even if it involves judging credibility, weighing evidence, or deciding issues that overlap with the merits of a plaintiff's claims.

*Id*.  (quoting *Harnish,* 833 F.3d at 304 (3d Cir. 2016) (citation omitted) (alteration in original).

The "ascertainability requirement focuses on whether individuals fitting the class definition may be identified without resort to mini-trials." *Hayes*, 725 F.3d at 359; *see also Marcus*, 687 F.3d at 593 ("If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."). The ascertainability requirement serves to eliminate "serious administrative burdens that are incongruous with the efficiencies expected in a class action," protect absent class members, and "protect defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Marcus*, 687 F.3d at 593. (citation and quotations omitted). In *Marcus*, the

---

[11] *See In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2017 U.S. Dist. LEXIS 135758, at *24-25 (E.D. Pa. Aug. 24, 2017) (explaining the Third Circuit has reaffirmed and not backed away from its "heightened" ascertainability standard).

Third Circuit noted courts have held the class definition fails where the individuals in the class are not identifiable by the company's databases. *Id.*

The Third Circuit in *Niaspan* further explained the importance of the ascertainability requirement to the class-certification decision:

> "[T]he class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."*Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Yet when members of a Rule 23(b)(3) class cannot be identified in an economical and administratively feasible manner, the very purpose of the rule is thwarted. Ascertainability serves several important objectives in preserving those efficiencies:
>
> > First, the heightened ascertainability requirement established by Third Circuit caselaw eliminates "serious administrative burdens that are incongruous with the efficiencies expected in a class action" by insisting on the easy identification of class members. Second, it protects absent class members by facilitating the "best notice practicable" under Rule 23(c)(2) in a Rule 23(b)(3) action. Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable.

*Niaspan*, 67 F.4th at 132 (internal citations omitted).

Although not acknowledged by Plaintiff, the Third Circuit in *Niaspan* reviewed and summarized Third Circuit decisions examining the "ascertainability requirement." 67 F.4th 118 (3rd Cir. 2023). In so doing, the panel reviewed no less than six of its prior decisions that addressed the "administrative feasibility" requirement that "class [members] . . . be currently and readily ascertainable based on objective criteria." *Id.* at 129-132 (quoting *Hargrove*). Notably, the court in *Niaspan* did not discuss or even reference the decision in *Kelly re RealPage, Inc.*, 47 F. 4th 202 (3rd Cir. 2022), that Plaintiff cryptically describes as "harmonizing Third Circuit case law on ascertainability." (Mem. at 24.)

2.    Plaintiff does not and cannot demonstrate that ascertaining class membership is administratively feasible.

Here, Plaintiff describes a two-step process for identifying class members. However, Plaintiff has failed to demonstrate that either of the two necessary steps are administratively feasible.[12]

Plaintiff first references the initial need to identify and extract on an automated basis, from three years of archived data from almost three (3) billion Trans Union credit reports, those reports purportedly contained bankruptcy remarks without a corresponding public record. (Mem. at 23). Because Trans Union has never performed such a task, and did not have a method to do so, Plaintiff retained Mr. Jaffe to devise methods to do so. As an initial matter, neither Trans Union nor Plaintiff's "data scientist" opinion witness has proposed a method to identify, locate, and retrieve the raw credit-report data from the three separate datasets containing such data, despite the several extensions of time granted by this Court for the parties to do so. (*See supra* at 7-10.) Trans Union eventually devised a method to extract data for a single month meeting Plaintiff's criteria from data in one of the three (3) datasets, and produced that requested data to Plaintiff and Mr. Jaffe. However, Trans Union was unable to devise methods for returning the vast majority of the class data from the other two datasets. (*See supra* at 8-9.) Although Plaintiff charged him with doing so, Mr. Jaffe has not proposed methods for doing so.

This failure by Plaintiff to devise a "reliable" or "currently and readily ascertainable" method for even the initial step in that process demonstrates that Plaintiff's putative class is not able to be identified.  The similar failure to devise the second step in determining members of the proposed class is equally fatal to Plaintiff's Motion.

---

[12] Plaintiff offers no actual estimate of the time it will take to identify the class. (*See supra* at 10-11.)

A second step in identifying actual class members involves determining which consumers for whom Trans Union reported bankruptcy remarks did not, in fact, file for bankruptcy. Plaintiff concedes the need for this additional step in light of the uncontradicted opinions of Ms. Wodzinski that the more absence of a public record bankruptcy is not a reliable indicator the consumer did not file for bankruptcy. (*See supra* at 11-15.) Therefore, Plaintiff now proposes for the first time (in Plaintiff's Motion) a manual search of public records to locate bankruptcy filings by consumers that mandate removal of those consumers from the class. In particular, Plaintiff now proposes to have unnamed staff of the law firm representing him to manually search public records of bankruptcies, using only SSN, to determine which consumers never filed for bankruptcy, thereby making them class members. (*See supra* at 25-26.) However, Trans Union has demonstrated, by a review of Plaintiff's efforts, including the discovery of bankruptcy filings that Plaintiff's abbreviated searches did not locate, that Plaintiff's method for establishing the inaccuracy of the class members' reports is fundamentally flawed and unreliable. (*See supra* at 16-17.)

As an initial matter, Plaintiff's new class definition, and the contemplated efforts of his law firm's paralegals, do not involve searching for all bankruptcy filing that might exclude people from the class.  Instead, the new definition only purports to exclude from the class those consumers "for whom there is no government-held public record filing within ten (10) years prior to the date of the report." (Mem. at 10.) Correspondingly, Plaintiff's counsel instructed the paralegals to search only for public records that were filed with ten (10) years of the one month of reports they examined. (Brennan Decl. at ¶¶ 8, 10.) However, Plaintiff does not explain why only bankruptcy filings within a decade of the credit report are relevant to proving the accuracy of the remark.

Moreover, Plaintiff's proposal to have paralegals search PACER using only full nine-digit SSNs cannot reliably determine whether a consumer actually filed for bankruptcy. Notably, Plaintiff proposes using only the SSN of the possible class member maintained by Trans Union. However, it has already been demonstrated that there are significant mismatches between the public record data and the data maintained by Trans Union, which is why the public record was not in the credit report. (*See supra* at 12-15.) As Ms. Wodzinski explained, data received from bankruptcy courts can omit certain data and can contain erroneous data, e.g., transposed digits in SSNs. *Id.* These issues are compounded here by the anomalous population of possible class members, i.e., people whose possible bankruptcies were not attributed to their files due to such data mismatches. (*See supra* at 16-18.)

Bank of America has separately reached the same conclusion. (*See* Patak Decl., Pl. Ex. 15, at ¶¶ 6 (observing "that bankruptcy filers sometimes include incomplete personal information in their bankruptcy petitions"), 17 (noting possibly inaccurate information in bankruptcy dockets).) Separately, bankruptcy court records on PACER include identifying information in addition to SSNs, i.e., names, street address, city, state, and zip codes of the debtors, that can be used to determine if a consumer possibly filed for bankruptcy. However, Plaintiff does not intend to use any of this available data to identify class members. Nor does he intend to devise additional search methods to account for missing or erroneous SSN data.

Even a cursory examination of Plaintiff's proposed list of class members (i.e., consumers for whom bankruptcy filing supposedly could not be found) demonstrates the flaws in his proposed process. As explained above, (*see supra* at 13-15), a review of the first 50 entries in Plaintiff's list of class members identified 30 bankruptcy filings that clearly or possibly relate to those 50 consumers, i.e., 60% of the supposed class members potentially filed for bankruptcy. 17

of the filings exactly matched the names, street addresses, cities, states, and zip codes of people Plaintiff claims his paralegals proved never filed for bankruptcy. (Hartman Decl. at ¶¶18, 20-21.) An additional 13 filings matched the names and states of residence of people Plaintiff claims are class members. (Hartman Decl. at ¶¶ 19-21.)

However, Trans Union is not claiming that this analysis definitively establishes that the bankruptcy filings it located definitely and definitively relate to the people Plaintiff claims are class members. As Ms. Wodzinski explained, especially when there are some differences in the data (e.g., addresses due to people moving), it can be challenging to make sure determinations. (*See supra* at 12-13.) For example, somebody who has regularly moved within the same state may have the same name as a bankruptcy debtor who also lives in that state. While it may be clearer that people with exactly matching names, street addresses, cities, states, and zip codes are the debtors, it is still possible that they are not. Thus, the only way to definitively establish that an individual never filed for bankruptcy is to obtain testimony from them about their prior addresses (and names) as well as whether they had ever filed for bankruptcy. That is why Mr. Brooks submitted a declaration here stating that he had never filed for bankruptcy *and* had never lived in Alabama (where the other Mr. Brooks filed for bankruptcy), and he did not simply rely on the work of his paralegals for such proof. (*See* Brooks Decl. at ¶¶ 5, 7.)

The failure of Plaintiff's proposed method to find all class-member bankruptcy filings ensures that people not satisfying the class definition will nonetheless be included in the class. Such a result is a "critical consideration" because "a high degree of over-inclusiveness could prevent certification." *City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 442 n.4 (3d Cir. 2017). As an initial matter, because Plaintiff's inexplicable proposal that his law firm's staff will only identify bankruptcies filed "within ten (10) years prior to the date of the

report," the proposed class is significantly over-inclusive. (Mem. at 10 (revised class definition).) It is also over-inclusive because it includes people who <u>did</u> file for bankruptcy.

Plaintiff cannot simply "fix" its flawed search methods by adopting the broader, more complete search techniques that Trans Union has used. Again, using only the same data from Trans Union's credit reporting database to perform the searches is insufficient because that same data failed to assign the public record to the Trans Union credit report. (*See supra* at 5-7.) Moreover, as evidenced by the recent efforts undertaken on behalf of Trans Union, matching putative class members to public records requires subjective "judgment calls" as to whether matching names with different addresses in the same state nonetheless indicate a match due to the consumer moving between the time of the bankruptcy filing and date of the Trans Union credit report.[13] The same would be true even for the filings exactly matching on names, street addresses, cities, states, and zip codes, in the event there was missing or erroneous data, or some other reason there are two people with the exact same name and full address but only one filed for bankruptcy (e.g., a father and son with the same names living in the same home). Again, as Plaintiff intends to do for his own claim, the only way to definitively establish whether a specific individual filed for bankruptcy and lived at a specific address or in a specific state is to obtain testimony from them.

"A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful." *Carrera v. Bayer Corp.*, 727 F.3d 300,

---

[13] This search process by Trans Union to test Plaintiff's 11th-hour theory of identifying class members surely did not find all relevant filings. For example, Trans Union only examined bankruptcy filings from states identified on the underlying credit-report data. (Hartman Decl. at ¶ 16.) However, consumers routinely move (*see* CW Rep. at ¶¶ 19(b), 22), and the bankruptcy filings often predate the credit report by years. Thus, Trans Union's process did not capture filings in states where consumers may have lived years before the report at issue. Because its conservative approach looked only for exact matches on identifying data, Trans Union did not identify name variations or account for typographical errors in names. Expanding the search to other states, and to account for typographical errors or name variations, may identify additional possible bankruptcy cases filed by people Plaintiff contends are class members who never filed for bankruptcy.

306 (3d Cir. 2013). Therefore, Plaintiff's proposed method for ascertaining class members is neither "reliable" nor "currently and readily ascertainable," *Niaspan*, 67 F.4th at 129-130, and therefore is not "administratively feasible." Accordingly, class certification should be denied.

## IV.    CONCLUSION

WHEREFORE, for all the reasons set forth above, Defendant Trans Union LLC respectfully requests that this Court deny Plaintiff's Motion for Class Certification.

Dated: March 1, 2024                                    Respectfully submitted,

By: *s/ Michael O'Neil*

Michael O'Neil *(pro hac vice)*
Albert E. Hartmann *(pro hac vice)*
Kristen A. DeGrande *(pro hac vice)*
**REED SMITH LLP**
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
T: 312-207-1000
E: michael.oneil@reedsmith.com
E: ahartmann@reedsmith.com
E: kdegrande@reedsmith.com

Joshua M. Peles
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
T: 215-851-8100
E: jpeles@reedsmith.com

*Attorneys for Defendant Trans Union LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of March 2024, I have electronically filed the foregoing using the Court's CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

/s/ *Michael O'Neil*
Michael O'Neil