**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM NORMAN BROOKS, III,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 22-0048-KSM** |
| **TRANS UNION LLC,** | |
| Defendant. | |

**MEMORANDUM**

MARSTON, J.                                                    December 2, 2025

Plaintiff William Norman Brooks, III, individually and on behalf of all others similarly situated, claims Trans Union violated Section 1681e(b) of the Fair Credit Reporting Act ("FCRA") when it sold third party creditors consumer credit reports that erroneously showed the consumers had filed for bankruptcy. After the Court granted Plaintiff's motion for class certification on August 1, 2024, the parties engaged in expert discovery to create a class list. Nearly a year after certification, Trans Union moves for class decertification, arguing that factual circumstances have changed that prevent the ascertainability and predominance requirements of certification from being met. Plaintiff moves to strike Trans Union's expert reports—which Trans Union relies on in moving for decertification—as untimely affirmative reports.

For the reasons discussed below, the Court denies both motions.

## I.    BACKGROUND

The facts underlying this case are set out more fully in the Memorandum ruling on Plaintiff's Motion for Class Certification. (*See* Doc. No. 116.) Because the Court writes primarily for the parties, the Court does not repeat those facts at length in this Memorandum, and

instead, includes only a brief overview of Plaintiff's claims, class certification, and the post-certification discovery at issue here.

###    A.    Class Certification

In January 2022, Plaintiff brought a putative class action complaint against Trans Union, which he amended the following month.  (Doc. Nos. 1, 13.)  The amended complaint brings claims under the FCRA and its California analogue.  (Doc. No. 13 ¶¶ 49, 56–65.)  In May 2024, this case was reassigned from the late Honorable Gene E.K. Pratter to the Honorable Karen Spencer Marston.  (Doc. No. 80.)  Following two years of class discovery and oral argument on Plaintiff's motion for class certification, the Court granted certification of a single class of individuals seeking relief under Section 1681e of the FCRA:

> All natural persons with an address in the United States and its Territories about whom Defendant sold a consumer report to a third party from January 6, 2020 to January 31, 2023 which included a bankruptcy remark on a tradeline, but with no reference to a bankruptcy record in the public record section of the same report, and for whom there is no government-held public record of a bankruptcy filing within ten (10) years prior to the date of the report.

(Doc. No. 116 at 1.)

Plaintiff proposed a two-step process for determining class membership.  First, Plaintiff's proposed expert Jonathan Jaffe ("Jaffe") would examine Trans Union's internal files to determine which of the files sold to a third party between January 6, 2020 and January 31, 2023 included a tradeline with a bankruptcy remark, but failed to include a record of bankruptcy in the public record section of the file ("Step One").  (Doc. No. 116 at 6.)  Second, Jaffe would use the full nine-digit social security numbers ("SSNs") to run Public Access to Court Electronic Records system ("PACER") searches to determine whether the SSN was associated with a bankruptcy filed within the past ten years ("Step Two").  (*Id.* at 6–7.)

Trans Union opposed class certification.  (*See* Doc. No. 48.)  The Court rejected Trans Union's arguments that the class was not ascertainable, including Trans Union's argument that using an individual's nine-digit SSN is not sufficiently accurate and Trans Union's proposals for other pieces of information that should be matched during Step Two.  (Doc. No. 116 at 20–21.)  The Court also concluded that the commonality and predominance requirements were met.  (*Id.* at 30–39.)

### B.    Post-Certification Discovery

After certification, the Court entered a scheduling order for the parties to engage in discovery, including related expert analysis, to identify consumers meeting the certified class definition.  (*See* Doc. Nos. 124, 127, 129, 130.)  Plaintiff's expert, Jaffe, issued two reports in which he developed a class list using the two-step process.  (*See* Jaffe Mar. 12, 2025 Report (Doc. No. 139-3, "Jaffe March 2025 Report"); Jaffe Apr. 22, 2025 Report (Doc. No. 139-4, "Jaffe April 2025 Report").)  In response to Jaffe's reports, Trans Union's experts, David Alfaro ("Alfaro"), Dr. David Lasater ("Dr. Lasater"), and Nicholas DeGiacomo ("DeGiacomo") issued three rebuttal reports on June 20, 2025.  (*See* Alfaro June 20, 2025 Report (Doc. No. 139-6, "Alfaro Report"); DeGiacomo June 20, 2025 Report (Doc. No. 139-8, "DeGiacomo Report"); Dr. Lasater June 20, 2025 Report (Doc. No. 139-7, "Dr. Lasater Report").)

For Step One, Jaffe searched Trans Union's internal files for records that included a bankruptcy remark on a tradeline with no reference to a bankruptcy record in the public record section of that report.  (Jaffe March 2025 Report ¶¶ 21, 35–41.)

For Step Two, because PACER changed their required search parameters to require the first two characters of the last name in addition to the nine-digit SSN, Jaffe used the SSNs and first two characters of the last name associated in Trans Union's Step One records and ran them

through PACER.  (*Id.* ¶¶ 22, 22 n.12, 42–44.)  This search resulted in 22,212 SSNs that had no

bankruptcy records returned, and 35,941 SSNs that had one or more bankruptcy filings that

predated the applicable consumer report by more than ten years.[1]  (*Id.* ¶¶ 26–27.)  After Jaffe

issued his March 2025 Report, he learned of a Thomson Reuters' service that can search an

archived version of public bankruptcy records and that permitted searching by only the nine-digit

SSN as represented at the time the Court certified the class.  (Jaffe April 2025 Report ¶ 16.)  So,

Jaffe again conducted Step Two, running a search for the nine-digit SSNs associated in Trans

Union's Step One records in the Thomson Reuters database.  (*Id.* ¶¶ 32–42.)  This search

resulted in the elimination of 920 individuals from the initial Step Two search, resulting in a

class list of 57,233 individuals.  (*Id.* ¶¶ 24–25; Jaffe Dep. Tr. (Doc. No. 139-5) at 303:24–

304:13.)

       Trans Union's expert Alfaro performed a "stress test" of Jaffe's Step Two methodology.[2]

(Doc. No. 139-1 at 12; Alfaro Report.)  He opined that Jaffe's methodology is flawed and

unreliable, due in part to Jaffe's limited search criteria.  (*Id.* ¶ 13.)  Dr. Lasater generated a

sample of the 20,891 class members for whom Jaffe's search failed to locate any public record of

a bankruptcy filing in PACER or Thomson Reuters.  (Dr. Lasater Report ¶¶ 16–18.)  Alfaro

reviewed a 400-person sample based on Dr. Lasater's list.  (Alfaro Report ¶ 36.)  Alfaro

manually reviewed public records in both PACER and Thomson Reuters for all 400 people,

using SSN, all name information, and all address field information from all addresses available

---

[1] It is against Trans Union policy to report bankruptcies that are more than ten years old.  (*See* Doc. No. 107-14 at 67:19–68:14.)

[2] Although Trans Union vigorously contested that Step One would be possible at the class certification stage (*see* Doc. No. 111 at 13–17; Doc. No. 116 at 16–20), Trans Union now raises no objection to the execution or efficacy of Step One for the purposes of this motion.  (*See* Doc. No. 139-1 at 18.)

on consumer reports in order to identify potentially matching bankruptcy filings.  (*Id.* ¶¶ 37–39.)

Through this process, Alfaro located "additional potential bankruptcy filings by Class Members"

based on complete and partial matching across all name and address attributes.  (*Id.* ¶ 13.)

Alfaro's approach concluded that sixty-nine of the 400 files (17.3% of the sample) matched

name and address attributes with public bankruptcy records, meaning that a customer may have

had bankruptcy filings.  (*Id.* ¶¶ 48, 53.)  For example, Alfaro located bankruptcy filings of SSNs

with one digit differing from the individuals in Jaffe's list, which Alfaro stated "could have been

the result of a typo, which would likely explain why Mr. Jaffe's methodology failed to identify

the bankruptcy."  (*Id.* ¶ 50.)  Dr. Lasater's report opined that the findings in Alfaro's 400-person

sample analysis could be extrapolated to the full 20,891 population.  (Dr. Lasater Report ¶¶ 23–

24, 33, Table 1.)

       Trans Union's other expert, DeGiacomo, also reviewed Jaffe's reports and opined that

Jaffe's methodology is flawed because it does not eliminate the reliability concerns, departs from

best practice, and carries substantial risk of systematic error.  (DeGiacomo Report ¶¶ 52–58, 60–

65, 66–67.)  DeGiacomo reviewed Alfaro's results and bucketed the additional potential

bankruptcy filings into five buckets relative to confidence based on the number of binary yes/no

matches.  (*Id.* ¶¶ 79–85.)  DeGiacomo opined that 110 of the 400 files (27.5% of the sample)

show "potential strong multi-attribute matching to bankruptcy filings."  (*Id.* ¶ 90.)

       Using another sample set from Dr. Lasater, Alfaro also manually reviewed a sixty-record

sample of the records of the 36,317 class members for whom Jaffe located a bankruptcy filing

public record that preceded the applicable consumer report by more than ten years.  (Alfaro

Report ¶ 61; Dr. Lasater Report ¶¶ 26–28.)  Alfaro identified three "potential public bankruptcy

records" out of the sixty in the sample that either completely or partially matched the non-SSN

characteristics.  (Alfaro Report ¶¶ 62–65.)  And, Dr. Lasater opined that Alfaro's results could be extrapolated to the entire 36,317 population.  (Dr. Lasater Report ¶ 34.)

### C.  Procedural History

On the eve of the parties' second scheduled mediation,[3] Trans Union moved for decertification on July 31, 2025.  (*See* Doc. No. 139.)  On September 11, 2025, Plaintiff filed his opposition brief.  (*See* Doc. No. 145.)  Trans Union filed its reply on September 22, 2025.  (*See* Doc. No. 148.)  Additionally, on September 11, 2025, Plaintiff moved to strike the untimely experts of Alfaro, Lasaster, and DeGiacomo.  (*See* Doc. No. 147.)  The Court held oral argument on November 5, 2025.  (*See* Doc. No. 156.)  This matter is fully briefed.  (*See* Doc. Nos. 149, 150, 151, 152.)  The Court begins with Plaintiffs' motion to exclude before addressing Trans Union's motion for decertification.

## II.  EXPERT REPORTS

Plaintiff asks the Court to strike Trans Union's expert reports as untimely, or alternatively, to provide Plaintiff with sixty days to issue a rebuttal report.

### A.  Legal Standards

Rule 26(a)(2) governs expert testimony disclosure and requires a party to disclose the identity of any witness it may use at trial to present evidence.  "A party must make these disclosures at the times . . . the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  The Court may impose sanctions if a party does not comply with these disclosure requirements.  Fed. R. Civ. P. 37(c)(1).  Specifically, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a

---

[3] The parties informed the Court that they were intending to participate in private mediation and on that basis, requested a series of extensions of the scheduling order deadlines, which the Court granted. (*See* Doc. Nos. 127, 128, 129, 130, 134, 135, 143.)

hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.* Sanctions may include payment of "the reasonable expenses, including attorney's fees, caused by the failure," or striking the pleadings in whole or in part. *Id.* (c)(1)(A) and (C).

Before excluding evidence, the Court must assess: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified [or the excluded evidence would have been offered], (2) the ability of that party to cure the prejudice, (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's [scheduling] order." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)). The Court must also evaluate the "importance of the evidence," which is "the most significant" consideration. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012).

### B.    Discussion

First, the Court disagrees with the Plaintiff's characterization of the Alfaro, Lasater, and DeGiacomo reports as untimely affirmative reports. The Court entered a scheduling order that provided "[i]f the evidence is *intended solely to contradict or rebut evidence on the same subject matter identified by another party*, counsel shall serve the information on counsel for every other party no later than June 20, 2025." (Doc. No. 124 at 2 (emphasis added).) Similarly, Rule 26(a)(2)(D)(ii) provides that "[a]bsent a stipulation or a court order," a party must make disclosures within 30 days after the other party's disclosure "if the evidence is *intended solely to contradict or rebut evidence on the same subject matter identified by another party*." Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). On June 20, 2025, Trans Union served the three expert

reports.  (*See* DeGiacomo Report; Alfaro Report; Dr. Lasater Report.)

In general, rebuttal evidence is admissible where it will "explain, repel, counteract or disprove the evidence of the adverse party."  *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974).  District courts have been reluctant to construe narrowly the phrase "same subject matter" beyond its plain language.  *See Fed. Trade Comm'n v. Innovative Designs, Inc.*, No. 16-cv-01669, 2018 WL 3611510, at *2–3 (W.D. Pa. July 27, 2018) (collecting cases).  Courts have interpreted "same subject matter" as requiring that a rebuttal report simply address the same topic as the affirmative report, as opposed to the same topic *and* methodology on which the affirmative expert relied.  *See, e.g.*, *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. 14-cv-341, 2016 WL 7042085, at *4 (C.D. Cal. Aug. 17, 2016) ("However, nothing about Rule 26 or the nature of rebuttal prohibits offering independent opinions or utilizing other methodologies.  In fact, offering a different, purportedly better methodology is a proper way to rebut the methodology of someone else."); *Associated Elec. Gas Ins. Servs. v. Babcock & Wilcox Power Generation Grp., Inc.*, No. 11-cv-715, 2013 WL 5771166, at *3 (D. Conn. Oct. 24, 2013) ("Although [the rebuttal report] does offer new analysis and calculations, the Court finds that such were undertaken in an effort to rebut and/or contradict the theory posted by [the affirmative expert], and are therefore proper.") (citations omitted); *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013) ("It is also acceptable for an expert to use new methodologies in a rebuttal for the purpose of rebutting or critiquing the opinions of Defendants' expert witness.").  Courts have consequently allowed expert rebuttal reports that "cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert."  *Nat'l Med. Imaging, LLC v. U.S. Bank N.A.*, No. 16-cv-5044, 2019 WL 9809616, at *2 (E.D. Pa. Jan. 31, 2019) (citations

omitted).

In his motion, Plaintiff urges that the Alfaro, Lasater, and DeGiacomo reports are not appropriately considered rebuttal reports because they "do not address Mr. Jaffe's actual opinions, which are limited to applying the class membership criteria ordered by the Court." (Doc. No. 147-1 at 12.)  Plaintiff urges that the Jaffe's reports' sole subject matter is "the existence of a group of consumer[s] [sic] who meet the same objective criteria: those who were the subject of a Trans Union credit report that included a bankruptcy remark on a tradeline but no public record bankruptcy with same nine-digit SSN filed in the ten years prior to the date of the credit report."  (Doc. No. 151 at 6.)  Plaintiff argues that Trans Union's experts' reports challenge whether Jaffe's "assignment" of comparing nine-digit SSNs is a reliable method for proving that a consumer did or did not file for bankruptcy.  (*Id.* at 13.)  While Plaintiff urges that Jaffe "simply identifies a group of individuals who have the same characteristics based upon the data produced" (Doc. No. 147-1 at 4), Jaffe's assignment was to produce the class list based on the methodology he proposed during certification on which the Court relied to find the class ascertainable.  (*See* Jaffe March 2025 Report ¶ 22; Jaffe April 2025 Report ¶ 20 (assignment was to "use the Thomson Reuters Bankruptcy Search to determine whether any of the Certified Class Member Reports would be excluded based upon bankruptcy filings returned in the Thomson Reuters Bankruptcy Search Results").)

In response, Trans Union argues that the Alfaro, Lasater, and DeGiacomo reports clearly constitute "evidence on the same subject matter" as Jaffe's reports.  (Doc. No. 149 at 15–16.) Alfaro, Lasater, and DeGiacomo's reports respond to the same subject matter of Jaffe's reports: the development of the class list using the methodology that Jaffe proposed during certification. (*See* Alfaro Report ¶ 9 ("Counsel asked that I evaluate the methodology Mr. Jaffe has developed

and deployed to identify bankruptcy filings by consumers who Mr. Jaffe determined met the"

class criteria); DeGiacomo Report ¶ 22 ("Counsel asked me to use my extensive experience in

entity matching to examine Mr. Jaffe's methodology and comment on its shortcomings, in light

of the applicable best practices.").) In reply, Plaintiff urges that Jaffe did not purport to identify

all potential bankruptcy filings or opine on the sufficiency of using nine-digit SSNs. (*See* Doc.

No. 151 at 3.)

The Court finds that it is proper for Alfaro, Lasater, and DeGiacomo to utilize new

methods in an effort to rebut and/or contradict the methodology posited and executed by Jaffe.

*See, e.g.*, *Innovative Designs*, 2018 WL 3611510, at *3 (finding a report is properly a rebuttal

even where it introduces new theories and calculations not previously raised in the case-in-chief

report). Additionally, for Alfaro and DeGiacomo to respond to the class list developed by Jaffe,

it needed to have Jaffe's final search results, necessitating the rebuttal report timeline. (Doc. No.

149 at 18–19.) And the Trans Union expert reports respond to "evidence on the same subject

matter." Fed. R. Civ. P. 26. These expert reports "explain, repel, counteract or disprove the

evidence" of Jaffe by opining that the class list developed by Jaffe does not properly determine

the individuals "for whom there is no government-held public record of a bankruptcy filing

within ten (10) years prior to the date of the report." *Nat'l Med. Imaging*, 2019 WL 9809616, at

*2; *cf. T.N. Incorporation, Ltd. v. Fid. Nat'l Info. Servs., Inc.*, No. 18-cv-5552, 2021 WL

5980048, at *4 (E.D. Pa. Dec. 17, 2021) (striking improper rebuttal report that went "well

beyond contradicting and rebutting evidence" where it attempted to introduce an expert report in

response to lay testimony). In addition, Plaintiff has been given the opportunity to depose these

experts, and their opinions will be subject to further cross-examination at trial. (Alfaro Dep. Tr.

(Doc. No. 145-3); DeGiacomo Dep. Tr. (Doc. No. 145-5); Lasater Dep. Tr. (Doc. No. 145-4));

*see Fed. Trade Comm'n*, 2018 WL 3611510, at *3.  Accordingly, in the Court's view, these reports address the "same subject matter" as Jaffe's reports and are thus rebuttal reports, which were timely filed under the Court's scheduling order.  *See TCL Commc'ns Tech. Holdings*, 2016 WL 7042085, at *4.

Alternatively, the Court finds that Trans Union's failure to comply with its discovery obligations was substantially justified.  Because there is a genuine dispute concerning compliance of the timeliness of the report, as evidenced by the arguments on whether the reports at issue were properly produced as rebuttal reports, this test is met.[4]  *See Selzer v. Dunkin' Donuts, Inc.*, No. 09-cv-5484, 2015 WL 3668647, *3 (E.D. Pa. June 15, 2015) ("The test is satisfied if there exists a genuine dispute concerning compliance.") (citing *Kinney v. Trustees of Princeton Univ.*, No. 04-cv-5252, 2007 WL 700874, at *5 (D.N.J. Mar. 1, 2007)).  Plaintiff urges that Trans Union was on notice that Plaintiff intended to argue that "the absence of a public

---

[4] Plaintiff's response to Trans Union's interrogatory no. 17 indicated that Jaffe's bankruptcy searches would be included in his class-wide proof of inaccuracy.  (Doc. No. 150-2 (Pl.'s Supp. Resp. to Interrog. No. 17, May 9, 2025) at 4–5 (citing to Jaffe's March and April Reports in response to "the type and content of the evidence that You intend to present in support of . . any other motion . . . to establish that, for each Putative Class Member the bankruptcy remark is inaccurate"); Doc. No. 150-3 (Pl.'s 3d Supp. Resp. to Interrog. No. 17, June 6, 2025) at 6–7 (supplemental response including Jaffe's testimony and expert reports).)  The parties disagree on the interpretation of this response.  (*See* Doc. No. 149 at 12–13; Doc. No. 151 at 4–5; Doc. No. 152 at 2–4.)  And Plaintiff now states that he does not intend to rely on Jaffe's opinions to argue that the lack of a public record bankruptcy with the same nine-digit SSN as a Trans Union credit report is proof that a consumer did not file for bankruptcy.  (Doc. No. 151 at 4.  *But see* Doc. No. 108 at 7 (stating "class membership and class-wide liability determinations will each be based on the answers to the same questions," including "Is there a public record bankruptcy for the same nine-digit SSN based on a mechanical search of PACER?"); Doc. No. 116 at 35 (during class certification, Plaintiff asserted that "matching nine-digit social security numbers to public records of bankruptcy filings yields competent evidence to demonstrate whether class members have filed for bankruptcy"); Doc. No. 145 at 23 (Plaintiff's opposition to motion for decertification, stating that "[c]ombined with the class-wide evidence that objective searches of bankruptcy filings revealed no bankruptcy within ten years prior to Trans Union's report with the same nine-digit SSN, a quintessential personal identifier in the credit reporting system, Plaintiff can present uniform evidence tending to show an inaccuracy for all class members.").)  Regardless, there is a "genuine dispute" concerning compliance with the rebuttal report deadline that justifies Trans Union's decision to proceed with rebuttal reports to respond to Jaffe's reports developing the class list.  *Selzer*, 2015 WL 3668647 at *3.

record bankruptcy with the same nine-digit SSN as a Trans Union credit report is evidence of whether a consumer filed for bankruptcy," and thus Trans Union should have disclosed this as affirmative evidence.  (Doc. No. 151 at 7.)  Trans Union responds that it was on notice that the results of Jaffe's analysis were relevant to the key merits issue of class-wide inaccuracy, and thus it was substantially justified in responding through rebuttal reports.[5]  (Doc. No. 152 at 5.)  Because a reasonable person would find that the parties could differ as to whether Trans Union's expert reports were rebuttal reports, the Court finds that Trans Union was substantially justified in relying on the expert reports as rebuttal reports.  Accordingly, exclusion of the reports is not warranted under Rule 37.  *See* Fed. R. Civ. P. 37(c)(1).

Moreover, Plaintiff has not established the factors justifying the sanction of exclusion, as the *Pennypack* factors weigh in favor of admitting the reports.[6]  As to the first factor, Plaintiff will not suffer substantial prejudice or surprise because the expert reports are consistent with the arguments Trans Union raised at initial certification, as Plaintiff acknowledged.  (*See* Doc. No. 147-1 at 15); *cf. Quinn v. Consol. Freightways Corp. v. Delaware*, 283 F.3d 572, 577 (3d Cir. 2002) ("[The defendant] therefore knew of [the witness's] testimony for months before attempting to strike it as a last minute surprise that justified sanctions as a discovery abuse.").

---

[5] Plaintiff argues that Trans Union should have disclosed its witnesses earlier than the rebuttal deadline because Jaffe provided his first report in March 2025.  (Doc. No. 151 at 8.)  Trans Union responds that because the experts performed their analysis on a sample of the final class list, it could only be analyzed after it received Jaffe's final report on April 22, 2025, which was the deadline for affirmative reports.  (Doc. No. 152 at 5.)  Again, this disagreement supports that there was a genuine dispute, and thus, Trans Union was substantially justified in relying on the reports as rebuttal reports.

[6] As a reminder, the *Pennypack* factors are: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified [or the excluded evidence would have been offered], (2) the ability of that party to cure the prejudice, (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's [scheduling] order."  *Konstantopoulos*, 112 F.3d at 719 (quoting *Pennypack*, 559 F.2d at 904–05).  The Court must also evaluate the "importance of the evidence," which is "the most significant" consideration.  *ZF Meritor*, 696 F.3d at 298.

The second factor is neutral.  Plaintiff had an opportunity to question Alfaro, Lasater, and DeGiacomo about their reports during deposition.  (*See* Alfaro Dep. Tr.; DeGiacomo Dep. Tr.; Lasater Dep. Tr.)  Additionally, Plaintiff did not raise this concern with the Court nor seek additional time for sur-rebuttal expert disclosure until after Trans Union moved for decertification.  (*See* Doc. No. 149 at 23.)  But Plaintiff urges that it had not understood the "degree to which its experts misunderstood the subject matter and scope of Mr. Jaffe's opinions" until they were deposed in July 2025 and did not have "knowledge of the purposes for which Trans Union would use its proposed experts' opinions until Trans Union filed its decertification motion."  (Doc. No. 151 at 3, 9.)  Because the experts' reports constitute critical evidence for Trans Union, however, Plaintiff may suffer prejudice if prevented from addressing the reports.

As to the third factor, permitting the expert reports would not disrupt the orderly and efficient flow of the case.  After Trans Union filed its decertification motion, the Court suspended the scheduling order, pending its decision on the motion for decertification.  (*See* Doc. No. 144.)  The fourth factor also weighs in favor of admitting the expert reports because there is no suggestion of bad faith by Trans Union.  *See, e.g.*, *Taylor v. Se. Pa. Transp. Auth.*, No. 23-cv-2140, 2024 WL 3205209, at *9 (E.D. Pa. June 27, 2024) (no suggestion of bad faith or willfulness supports admission).  Finally, these opinions are critical to Trans Union's defenses in this case related to the class and the core element of inaccuracy of the reports.  (*See* Doc. No. 149 at 24 (describing the reports as "core defense evidence as to the element of inaccuracy"); Doc. No. 147-1 at 16 ("Trans Union plainly intends to rely on these reports as a centerpiece of its defense to this case.").)  In sum, the *Pennypack* factors weigh in favor of allowing the expert opinions.

As explained above, this situation is not one that justifies the harsh sanction of exclusion.

*Cf. SuperMedia LLC v. Morley*, No. 12-cv-2329, 2014 WL 5023386, at *11 (E.D. Pa. Oct. 8,

2014) (striking an untimely report in which there was a "strong inference of fraud upon the

court"); *Apotex, Inc. v. Cephalon, Inc.*, No. 06-cv-2768, 2014 WL 4933009, at *2 (E.D. Pa. Oct.

1, 2014), *order clarified*, 2015 WL 12645745 (E.D. Pa. May 26, 2015) (striking a supplemental

expert report that came "after the 11th hour" and after the experts' depositions).  Accordingly,

the Court declines to strike the expert opinions under Rule 37.

### C.    Sur-rebuttal Evidence

Alternatively, Plaintiff requests sixty days to serve a sur-rebuttal report.  Plaintiff does

not cite to case law in support of this request.  (*See generally* Doc. No. 147-1 at 15–16.)  In its

sur-reply, Trans Union states that Plaintiff ignores its request to rebut any new reports offered by

Plaintiff.  (Doc. No. 152 at 6.)  However, the Court cannot locate such a request in Trans Union's

briefing.  (*See generally* Doc. No. 149.)  During oral argument, Plaintiff consented to such a

request.  (*See* Nov. 5, 2025 Hrg. Tr. at 58:2–5.)

Generally, "sur-rebuttal evidence is permissible only where a party in rebuttal introduces

subject matter not previously raised in its case-in-chief."  *Ries v. CSX Transp., Inc.*, No. 96-cv-

3325, 2000 WL 377509, at *4 (E.D. Pa. 2000) (disallowing sur-rebuttal testimony at trial where

no new issues were raised on rebuttal) (citing *F. W. Woolworth Co. v. Contemporary Arts*, 193

F.2d 162, 167 (1st Cir. 1951)).  "The decision of whether to allow a party to present evidence in

rebuttal or sur-rebuttal beyond the initial rebuttal report is committed to the trial court's

discretion."  *Fed. Trade Comm'n*, 2018 WL 3611510, at *4; *see also La. Health Care Self Ins.

Fund v. United States*, No. 12-cv-766, 2014 WL 3720526, at *1 (M.D. La. July 25, 2014) (noting

that Rule 26(a)(2)(D)(ii) neither grants a right to file a sur-rebuttal nor prohibits sur-rebuttal

reports, and observing that "a party wishing to provide a sur-rebuttal must first seek leave of

Court") (collecting cases).

Given the *Pennypack* factors, permitting Plaintiff to file a sur-rebuttal report is supported. The Court finds that the prejudice by Trans Union would be limited given the awareness of these disagreements as to the class list, Trans Union will be able to challenge any sur-rebuttal report through cross-examination, it would not disrupt the orderly and efficient trial of the case due to the suspension of deadlines, and Trans Union does not suggest any bad faith by Plaintiff. Given the importance of this issue, namely the certification of the class and the evidence of an inaccuracy on the class individual's consumer reports, the Court believes it is appropriate to give both parties a full opportunity to present their cases. *See Midwest Feeders, Inc. v. Bank of Franklin*, No. 14-cv-78, 2016 WL 4074432, at *3 (S.D. Miss. July 29, 2016) (finding that "Defendant should be afforded an opportunity to designate a surrebuttal expert for the limited purpose of contradicting or rebutting [opposing expert's] opinions" since "the topic being discussed by experts drifted").

Accordingly, the Court will use its discretion to permit Plaintiff to file a sur-rebuttal report within sixty days of the accompanying Order. And, as the Plaintiff consented to Trans Union's request, Trans Union may file a sur-rebuttal report within thirty days of receipt of Plaintiff's report.

## III.    CLASS DECERTIFICATION

### A.    Legal Standards

Rule 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Courts may decertify a class where appropriate after the case develops. *Barnes v. Am. Tobacco Co., Ins.*, 161 F.3d 127, 140 (3d Cir. 1998) ("Under Rule 23(c)(1), District Courts are required to reassess their class

rulings as the case develops."). "[C]ourts are divided on who shoulders the burden of proof at the decertification stage." *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351, 367 (E.D. Pa. 2023), *appeal dismissed*, No. 23-8021, 2024 WL 1793554 (3d Cir. Jan. 10, 2024); *In re Pharmacy Benefit Managers Antitrust Litig.*, No. 06-cv-1782, 2017 WL 275398, at *34 (E.D. Pa. Jan. 18, 2017) ("The question of which party has the burden on a motion to decertify a previously certified class is not settled."). *Compare In re Atl. Fin. Fed. Sec. Litig.*, No. 89-cv-645, 1992 WL 50072, at *2 (E.D. Pa. Feb. 28, 1992) ("Consequently, when seeking decertification of a class, the defendant bears a heavy burden to show that there exist clearly changed circumstances that make continued class action treatment improper."), *with Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) ("Thus, as to the class-decertification issue, [Plaintiff], as the party seeking class certification, bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met.") (cleaned up).

Regardless of where the burden lies, decertification is an "extreme step [] particularly at a late stage in litigation." *Korrow v. Aaron's Inc.*, No. 10-cv-6317, 2015 WL 7720491, at *10 (D.N.J. Nov. 30, 2015) (cleaned up). "If, upon considering the record, the court finds that the criteria for and goals of class certification are no longer being met, [a] motion for class decertification should be granted." *Barkouras v. Hecker*, No. 06-cv-0366, 2007 WL 4545896, at *1 (D.N.J. Dec. 19, 2007) (internal citation and quotation marks omitted). The essential question is whether circumstances have changed since certification. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2017 WL 3494221, at *3 (E.D. Pa. Aug. 14, 2017) ("Generally, class decertification is prompted by a change in factual circumstances or developments in applicable substantive or procedural law.").

The legal standard governing class certification is discussed at length in the

Memorandum granting class certification, so the Court does not restate it here.  (*See* Doc. No. 116.)  Trans Union argues that decertification is appropriate because factual circumstances have changed such that Plaintiff cannot demonstrate ascertainability or predominance and because maintaining certification would violate Trans Union's due process rights.  The Court will address each argument in turn.

### B.    Ascertainability

For a class to be ascertainable, the Court must find "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).  Courts have discussed three reasons for this standard:

> First, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class.  Second, it ensures that a defendant's rights are protected by the class action mechanism, and that those persons who will be bound by the final judgment are clearly identifiable.  Finally, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action.

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017) (cleaned up).

Plaintiff's class is defined with reference to four objective criteria: (1) Trans Union sold a class member's credit report to a third party between January 6, 2020 and January 31, 2023; (2) the credit report contained a bankruptcy remark on a tradeline; (3) the credit report lacked a corresponding public record of a bankruptcy; and (4) there is no government-held public record of a bankruptcy filing by the class member within ten years of the month in which Trans Union sold the credit report.  Trans Union's decertification motion is focused on the fourth criteria: the government-held public record of a bankruptcy filing within ten years of the report, which is

determined in "Step Two" of Jaffe's methodology.  In granting the motion for certification, the Court concluded that Plaintiff's proposal for searching the PACER database for public records was a reliable and administratively feasible mechanism for identifying class members.  (Doc. No. 116 at 20–25.)

In opposition to certification, Trans Union proposed a variety of other pieces of information that could be cross referenced with public records, including name and address information.  (*See* Doc. No. 111 at 22–24.)  The Court rejected this "muddying of waters" as an argument on the merits of the class FCRA claims, rather than an ascertainability argument.  (Doc. No. 116 at 20.)  Trans Union did not present evidence that the nine-digit SSNs on PACER unreliably reflected the nine-digit SSNs of the individuals who filed for bankruptcy, or that any of the SSNs used to perform the PACER searches was inaccurate.  (*Id.* at 21.)

Now seeking decertification, Trans Union argues that subsequent facts discovered by its experts call into question whether the class is ascertainable using individuals' nine-digit SSNs.  (Doc. No. 139-1 at 17.)  Trans Union urges that its experts Alfaro and DeGiacomo found that between 17% and 28% of the consumers Jaffe identified in Step Two "actually *did* match with a 'government-held public record of a bankruptcy filing' within the relevant period and thus do *not* satisfy the class definition" (Doc. No. 139-1 at 18), or put differently, that Jaffe's Step Two process "did not capture all of those who *actually did file* for bankruptcy" (*id.* at 17 (emphasis added)).  But this is not true.  Rather, as Plaintiff points out, Trans Union misstates its experts' conclusions, which "simply identif[ied] 'potential' bankruptcy filings by using personal identifiers *other* than nine-digit social security numbers . . . and [were] not opining that these 'potential' bankruptcies were in fact filed by class members."  (Doc. No. 145 at 5.)  A close examination of the expert reports reveals that the experts opine only that Jaffe's methodology

"does not reliably identify all *potential* bankruptcies associated with the Consumer Report information available to him"; they do not opine on whether the individuals identified *actually* filed for bankruptcy.  (Alfaro Report ¶ 66 (emphasis added).)  Trans Union's experts failed to take their analysis to the next step and determine whether the relevant consumers "actually did" file for bankruptcy.[7]  (*See* Alfaro Dep. Tr. at 90:15–91:12 ("My use of 'potential' is . . . because I cannot affirm if they are the same person.  I can only indicate through the indicia available to me that they are very likely the same person."); DeGiacomo Dep. Tr. at 155:13–23 ("That's my entire point is these are all probabilistic.  I'm not making any claim on the individuals here" that they did in fact file for bankruptcy.); Lasater Dep. Tr. at 31:24–32:3 (describing "no insight" on whether any of the persons within the sample actually filed for bankruptcy).)  Nor did Trans Union offer evidence on the prevalence of typographical errors in either Trans Union's own files or PACER or Thomson Reuters filings that Trans Union's experts suggest are to blame for the mismatch, outside of referring to the report and testimony of Corrine Wodzinski, which was presented during certification.[8]

---

[7] If Trans Union's experts had taken the sample through the next step to determine what percentage *actually did* file for bankruptcy, then there may have been a change in factual circumstances that would warrant decertification.  Here, it remains a hypothetical question, and the Court remains convinced that matching records on the basis of the search of a unique nine-digit SSN against the public record database is a reliable process.

[8] Alfaro's reference to the potential existence of typos is supported by the testimony of Trans Union employee Corrine Wodzinski which was limited to errors within Trans Union's internal files.  (Alfaro Report ¶ 34; *see also* Jaffe Dep. Tr. (Doc. No. 139-5) at 346:8–10 ("[T]here's no evidence that Trans Union's data is replete with inaccurate social security numbers for this set of consumers.").)  There is no evidence offered regarding the incidence of typographical errors in public records.  (*See, e.g.*, DeGiacomo Dep. Tr. at 123:7–125:19 (Wodzinski testified about errors within Trans Union's records, but not errors within bankruptcy court records);136:15–17 ("I have not analyzed the court documents to see what cases – how many times a spelling mistake occurs or something along those lines.").)  Further, 55% of the possible bankruptcies Alfaro identified involve SSN differences of *five digits or more* and 20 of Alfaro's possible bankruptcies *share no SSN digits at all*, suggesting that the experts' disagreements are not purely the result of simple typos or transposition.  (*See* Doc. No. 145 at 14; Nov. 5, 2025 Hearing Tr. at 41:1–42:12 (discussing Ms. Wodzinski's testimony and the concept of transposition).)

As the Court explained in the Memorandum granting certification, the matching of name, street address, city, and zip code, without a matching SSN, may appear to be strong evidence that the PACER record belongs to the corresponding class member, but it is not.  The Consumer Financial Protection Bureau has explained that, especially for Hispanic, Asian, and Black communities with low name-diversity, name-only matching is likely to lead to inaccuracies on credit reports.  *See* Bureau of Consumer Fin. Prot., Advisory Opinion on Name-Only Matching Procedures and Fair Credit Reporting (Nov. 10, 2021), 86 Fed. Reg. 62468, 62470.  And relying on names and addresses also ignores the existence of large apartment buildings, especially in certain communities, that may contain multiple residents who share the same name and address. (*See* Doc. No. 116 at 22 n.23.)  Yet Trans Union's experts do not acknowledge this—likely because the experts did not opine that any of the individuals *actually filed* for bankruptcy.  (*See also* DeGiacomo Dep. Tr. at 154:11–155:7 (his findings could include circumstances where the filer used a Jr. suffix and the credit report related to a Sr. suffix, but the suffixes were absent in the report and filing); Alfaro Dep. Tr. at 92:22–93:2 (no opinion "one way or another" whether fathers or sons get credit history confused due to similar name and same addresses).)

Trans Union's experts also do not opine that Jaffe's methodology failed to develop a list of individuals for whom no bankruptcy record with a matching nine-digit SSN within ten years prior to the date of Trans Union's published report, as Plaintiff had proposed during certification. (DeGiacomo Dep. Tr. at 73:16–22, 139:11–20 (not disputing that Jaffe conducted the nine-digit SSN searches correctly).)[9]  Rather than urge that Jaffe failed to execute the method proposed during certification, Trans Union urges that the class is not ascertainable because it requires a

---

[9] Alfaro does identify two "test subject" records appearing within Jaffe's class list.  (*See* Alfaro Report ¶¶ 16–17.)  Plaintiff responds that it is unclear why Trans Union produced data to test subjects and that Trans Union confirmed that there are only two instances where "TEST" or "POSTTEST" appear as names.  (*See* Doc. No. 145 at 15 n.18; *see also* Lauren Brennan Decl. (Doc. No. 145-1) ¶ 12.)

manual, fact-intensive analysis like the one Alfaro conducted. But this is just a repeat of the argument Trans Union offered in opposing certification, without any change of factual circumstances to call into question the Court's determination that the ascertainability requirement has been met. (*See generally* Doc. No. 116.) There is still no evidence presented that the nine-digit SSNs on PACER unreliably reflected the nine-digit SSNs of the individuals who filed for bankruptcy, or that any of the SSNs used to perform the PACER searches was inaccurate. Moreover, this is not a situation in which Plaintiff modified the methodology and approach for developing the class list from that proposed during certification, other than the shift to use Thomson Reuters for further exclusion using only the nine-digit SSN. *Cf. Bayshore Ford Truck v. Ford Motor Co.*, No. 99-cv-741-JLL, 2010 WL 415329, at *4 (D.N.J. Jan. 29, 2010) (granting decertification when the plaintiff's expert's methodology was "not the method proposed by him to this Court prior to class certification and on which this Court's class certification decision relied").

Trans Union urges that the factual circumstances now differ from that in *Kelly v. RealPage, Inc.*, 47 F.4th 202 (3d Cir. 2022). But *Kelly* bolsters Plaintiff's case for ascertainability, just as it did during class certification. (Doc. No. 116 at 23.) In *Kelly*, the Third Circuit Court of Appeals overturned the district court's denial of class certification on the basis of ascertainability in a case brought under Section 1681g of the FCRA. *Kelly*, 47 F.4th at 205. As alleged, RealPages, a credit reporting agency, unlawfully failed to disclose to the plaintiffs the sources of public information it used to produce the plaintiffs' erroneous credit reports. *Id.* at 207–08. The plaintiffs sought to certify a class of individuals who received reports from RealPage that did not include, as required by the FCRA, the public record information upon which RealPage had relied in producing the credit report. *Id.* at 208–09. The district court

concluded that this class was not ascertainable because figuring out which credit reports

"contained public record information . . . would require '[a] review of each individual file,'"

which the district court found to be "not administratively feasible." *Id.* at 210 (alteration in

original). The Third Circuit explained, however, that there is no per se rule that file-by-file

review is not administratively feasible. *See id.* at 223–25. The Third Circuit stated that "a

straightforward 'yes-or-no' review of existing records to identify class members is

administratively feasible even if it requires review of individual records with cross-referencing of

voluminous data from multiple sources." *Id.* at 224. That still applies here. Trans Union's

experts do not change the Court's conclusion that SSNs are a reliable, objective method for

developing the class list.

Nor does *McMahon v. Chipotle Mexican Grill, Inc.* sway the Court. No. 24-1883, 2025

WL 1604501 (3d Cir. June 6, 2025). In *McMahon*, the Third Circuit affirmed the district court's

denial of class certification, agreeing that it was not a "straightforward yes-or-no review" to

determine whether a proposed class member fits within the objective criteria where the parties

would need to identify if a consumer was shortchanged by cross-referencing the cash

transactions within Chipotle's data, customer receipts, information in customer complaints,

Chipotle Rewards membership information, restaurant surveillance footage, and affidavits. *Id.* at

*2. That is not the case here. Although Trans Union urges that Alfaro had to evaluate all aspects

of available consumer name and address data to identify matching bankruptcy public records, all

of that information is located within Trans Union's own file for the consumer and the public

record. Nor did Alfaro or DeGiacomo confirm that any of the identified individuals *actually*

*filed* for bankruptcy. Neither party argues that consumers would need to submit an affidavit or

that data from outside Trans Union's own files, PACER, or Thomson Reuters is required.[10]

There is still no evidence before the Court to suggest that any of the other standards Trans Union proposes is a sufficient, objective basis for determining whether the public record of a bankruptcy from PACER or Thomson Reuters actually belongs to the consumer who is the subject of the report Trans Union sold.  (*See* Doc. No. 116 at 37.)  Accordingly, there is no change of circumstance that disturbs the Court's prior classification decision finding ascertainability satisfied.

### C.       Predominance

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).  The focus of this inquiry "is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011).  "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (internal quotation marks omitted).  The elements of a cause of action under Section 1681e(b) are: "(1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was caused by

---

[10] DeGiacomo did testify, however, that the best way to determine if someone in fact filed for bankruptcy would be to ask them.  (*See* DeGiacomo Dep. Tr. at 83:9–84:5 (suggesting that the best way "to be very confident" that an individual filed for bankruptcy in the absence of every possible record concerning the individual is to "ask them directly"); *see also* Nov. 5, 2025 H'rg Tr. at 12:10–12 ("We can't know until we actually conduct discovery and by testimony from a particular person.").)

the inclusion of the inaccurate entry." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 708 (3d Cir.

2010) (quoting *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996)).

Once again, the dispute between the parties concerns what constitutes competent

evidence for demonstrating whether an individual has filed for bankruptcy.  Just as it did when it

opposed certification, Trans Union argues that individualized "mini-trials" will need to take

place in order to determine whether class members have in fact filed for bankruptcy.  Although

Trans Union urges that factual circumstances have changed to justify decertification, the

arguments and facts remain the same.[11]  Trans Union may present an argument, using the expert

reports, that the lack of a matching nine-digit SSN bankruptcy filing on PACER or Thomson

Reuters does not constitute proof that Trans Union's reports were inaccurate.  A jury will decide

this issue.  This has not changed since certification.  So it appears it is still the case that:

> In a trial on the merits, Plaintiff appears poised to argue that the lack
> of a public record of a bankruptcy on PACER [and Thomson
> Reuters] matching the nine-digit social security number on Trans
> Union's credit report establishes the inaccuracy of that report.  Trans
> Union appears poised to argue that it does not.  Resolving this issue
> will not require tens of thousands of mini-trials.  Instead, it will
> require class-wide evidence about how to objectively determine, by
> using both Trans Union's files and the public record, whether class
> members have filed for bankruptcy—class-wide evidence that
> saturates the record presently before the Court.

(Doc. No. 116 at 38–39.)

Trans Union's reliance on *Drummond v. Progressive Specialty Ins. Co* is likewise

misplaced.  142 F.4th 149 (3d Cir. 2025).  In *Drummond*, the plaintiff sought to bring a class of

drivers who allege Progressive systematically underestimated the actual cash value of their cars

and so breached its insurance agreements with them.  *Id.* at 152.  The Third Circuit concluded

---

[11] And as described above, Trans Union's contention that "Alfaro's analysis invalidated the
results of SSN searches in a Thomson Reuters database" overstates Alfaro's analysis, which concluded
that there were *potential* records of bankruptcy.  (Doc. No. 139-1 at 22.)

that proving whether Progressive undercompensated each class member is an individual issue incapable of proof on a class-wide basis and thus failed the predominance inquiry. *Id.* Whether Progressive underpaid an insured by compensating them less than the actual cash value of their totaled vehicle was a key element of the breach claim, but the plaintiff could not present class-wide proof that each class member was actually paid less than true actual cash value. *Id.* at 159. By contrast, at a trial on the merits here, Plaintiff may present class-wide evidence about how to objectively determine, by using Trans Union's files and public records, whether the class members have filed for bankruptcy.[12] *Cf. Schueler v. H&R Block Mortg. Corp.*, No. 07-cv-00342, 2009 WL 10671973, at *5–6 (C.D. Cal. Aug. 10, 2009) (concluding predominance inquiry fails where plaintiffs rely on individualized, anecdotal Fair Labor Standards Act evidence and individualized inquiry into "whether, how, when, and why any Plaintiff missed meal breaks."). This inquiry does not require a "case-by-case assessment." *Klotz v. Trans Union, LLC*, 246 F.R.D. 208, 216 (E.D. Pa. 2007).

After careful consideration, the Court again concludes that Trans Union's argument is a red herring that obfuscates more than illuminates the predominance inquiry. (Doc. No. 116 at 37.) The parties disagree on what method is best for matching public records of bankruptcy actions to individuals. But as the Court stated in granting certification, Trans Union's argument boils down to the proposition that there is no single conclusive way to determine whether individuals have filed for bankruptcy because bankruptcy data can be matched with individuals

---

[12] In other words, whether the Clark Rule, which prohibits Trans Union from disseminating credit reports that contain a reference to bankruptcy unless there is a corresponding public record for that bankruptcy, should apply to determine if credit reports are accurate. (*See* Doc. No. 116 at 116 (discussing origin of Clark Rule).) The *Clark* class was certified despite the credit reporting agencies' objections on numerosity, commonality, typicality, adequacy of representation, and predominance grounds. *See Clark v. Experian Info. Sols., Inc.*, No. 00-cv-1217-24, 2002 WL 2005709 (D.S.C. June 26, 2002). The *Clark* Court concluded that "[i]t follows that the legal issue of whether the information on the class members' tradelines was misleading is a common question for all class members." *Id.* at *11.

in many different ways. (*Id.* at 37.) If that were true, Trans Union would be unable to sell credit reports with any reasonable degree of certainty. *Cf. Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197–98 (E.D. Va. 2015) ("In general, courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class."); *see also* 15 U.S.C. § 1681e(b) (A consumer reporting agency "shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.") (emphasis added).

Moreover, "the presence of some number of uninjured class members at the class certification stage does not categorically bar a finding of predominance under Rule 23(b)(3)." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 133 (D.D.C. 2017), *aff'd sub nom.*, *In re Rail Freight Fuel Surcharge Antitrust Litig., MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019). At argument, Trans Union urged that its expert reports established that there was a non-de minimis number of class members that are uninjured. (Nov. 5, 2025 H'rg Tr. at 29:19–31:14.) But the Court does not credit Trans Union's expert opinions finding between an 17% and 28% error rate, as that includes several entries where the SSN differs by all nine digits. And Trans Union's experts do not offer any evidence to dispute the use of SSNs for confirming whether an individual filed for bankruptcy. *Cf. Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982) (per curiam) ("The social security number is the single most important identifying factor for credit-reference purposes."); *Tschida v. Motl*, 924 F.3d 1297, 1304 (9th Cir. 2019) ("[A]n individual's SSN serves as a unique identifier that cannot be changed and is not generally disclosed by individuals to the public." (quotations and citations omitted)). Neither Trans Union's experts nor its counsel explain why matching with non-SSN characteristics indicates that there was an error in the class member identifications made using

only SSNs such that the Court can conclude a potential class member is uninjured.  Indeed, the only evidence is the evidence previously presented to the Court at certification: Corinne Wodzinski's testimony, in which she stated it "would be great" if the parties had the nine-digit SSN to match as opposed to the four-digit SSN.  (*See* July 9, 2024 H'rg Tr. at 27:6-18.)  The Court does not credit DeGiacomo's confidence buckets because they do not account for the SSNs at all, instead relying on other characteristics without justifying the lack of consideration of the SSN.  (DeGiacomo Report ¶¶ 77–85.)

The Court has reviewed the experts' reports and determined that nineteen of the sixty-nine records Alfaro identified appear to be most likely caused by error, including simple typographical errors or transposed numbers, that support a finding that that individual did likely file for bankruptcy but that there was a data entry error in the SSN.  (*See generally* Ex. 6 to Brennan's Declaration (summarizing the entries with the number of SSN digits conflicting).)  That results in a 4.75% error rate, which is still speculative.  The Court concludes that such over-inclusiveness does not defeat class certification because the uninjured parties likely represent a de minimis portion of the class.  *See In re Lidoderm Antitrust Litig*., No. 14-MD-2521, 2017 WL 679367, at *11 (N.D. Cal. Feb. 21, 2017) (finding that three uninjured individuals out of a class of fifty-five is de minimis).  *Contra Vista Healthplan, Inc. v. Cephalon, Inc*., No. 06-cv-1833, 2015 WL 3623005, at *20 (E.D. Pa. June 10, 2015) (finding that predominance is not met where a class has 5% uninjured "combined with the substantial likelihood" that some more class members were also uninjured "indicates that the prevalence of uninjured class members is more than de minimis").

The Court previously engaged in the "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove" the necessary

elements. *In re Hydrogen Peroxide*, 552 F.3d 305, 312 (3d Cir. 2008). Trans Union's new expert reports do not disturb the Court's conclusions in that assessment.

### D.    Due Process

Trans Union argues that class decertification is necessary because permitting this case to proceed to trial on a class-wide basis would violate due process. (Doc. No. 139-1 at 23.) Trans Union cites mostly out of circuit cases in which due process is discussed in the context of Rule 23 requirements: ascertainability, predominance, and superiority. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (affirming class certification denial where plaintiffs' damages model did not prove any class-wide injury, thus failing predominance); *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 214 (E.D. Pa. 2017) (denying class certification because the proposed class did not fit within Rule 23(a) or Rule 23(b)(3), and noting that "due process concerns [would] arise because the Class definition is over-inclusive"); *Schueler*, 2009 WL 10671973, at *5–6 (superiority requirement allows for respect of the defendant's due process rights).[13] Indeed, "[a]scertainability provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). As the Court has concluded however, the class is ascertainable and meets the Rule 23 requirements. Accordingly, Trans Union's due process rights are protected.

*    *    *

Accordingly, decertification is inappropriate because Trans Union does not present a

---

[13] Trans Union also cites cases which do not discuss due process. *See Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 262 (4th Cir. 2012) (reversing district court's order granting class certification due to failure to show typicality); *Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 702 (N.D. Ga. 2012) (denying class certification because predominance requirement not met).

change of circumstances that would justify decertification.

**IV.    CONCLUSION**

For the reasons discussed above, Plaintiff's motion to strike untimely experts is denied and Trans Union's motion for decertification is denied.  Plaintiff and Trans Union are permitted leave to file sur-rebuttal reports.  An appropriate Order follows.